**STATE v. ALLEN**

[222 N.C. App. 707 (2012)]

_____

STATE OF NORTH CAROLINA v. DERRICK ALLEN

No. COA11-744

(Filed 4 September 2012)

**1. Appeal and Error—challenged findings—no argument advanced on appeal—abandoned—binding**

The State abandoned its challenges to certain findings of fact for which no argument was advanced on appeal. Those facts were deemed binding for purposes of appellate review.

**2. Discovery—disclosure of evidence—impeachment value— prior to guilty plea—timely disclosure**

The trial court erred in a first-degree murder, felony child abuse, and first-degree statutory sex offense case by concluding that the State flagrantly violated defendant's rights under *Brady v. Maryland*, 373 U.S. 83, both prior to the entry of his plea and prior to the hearing on defendant's dismissal motion, by failing to disclose, in a timely manner, certain evidence. Although a polygraph report and a witness's statement tended to undermine her credibility and did, for that reason, have impeachment value, the State was not constitutionally required to disclose material impeachment evidence prior to defendant's decision to enter a guilty plea. Further, as defendant's guilty pleas were subsequently vacated and the State provided the relevant information to defendant approximately six months prior to the hearing on his dis-

missal motion, defendant received the evidence in question at a time when he had ample opportunity to make effective use of it.

**3. Discovery—violations—willful failure to provide honest lab report—material not exculpatory**

The trial court erred in a first-degree murder, felony child abuse, and first-degree statutory sex offense case by concluding that the State flagrantly violated defendant's rights under *Brady v. Maryland*, 373 U.S. 83, by willfully failing to provide an accurate, honest lab report documenting the negative results of confirmatory blood testing and by providing defendant with a deceptively written report designed to obscure the fact that confirmatory blood testing was performed and yielded negative results. Certain components of the trial court's findings of fact lacked adequate record support; the undisclosed information did not constitute material exculpatory evidence for purposes of *Brady*; defendant's trial counsel could have, through independent investigation, determined what certain notations in the lab report meant; and defendant had been allowed to withdraw his guilty pleas, which meant that he occupied the position of a defendant awaiting trial rather than the position of a convicted criminal defendant.

**4. Discovery—disclosure of evidence—not required prior to guilty plea—timely disclosure**

The trial court erred in a first-degree murder, felony child abuse, and first-degree statutory sex offense case by concluding that the State's failure to disclose information concerning the practices and procedures employed in the SBI laboratory constituted a violation under *Brady v. Maryland*, 373 U.S. 83. *Brady* does not require the disclosure of material impeachment evidence prior to the entry of a defendant's plea and disclosure was made in time for defendant to make effective use of the evidence at any trial that may eventually be held in this case.

**5. Evidence—confirmatory blood testing results—not material misstatement**

The trial court erred by concluding that the charges of first-degree murder, felony child abuse, and first-degree statutory sex offense should be dismissed based on the presentation of false information at the time of defendant's initial plea hearing. Although the trial court's findings that Special Agent Elwell informed the prosecutor that stains on the victim's underwear gave positive indications for the presence of blood in preliminary

testing but that subsequent confirmatory testing produced negative results were supported by the record, the trial court erred by concluding that the prosecutor made a material misstatement of fact at defendant's plea hearing, given that the confirmatory testing results did not constitute "material" evidence. Furthermore, given that defendant's guilty pleas were vacated, defendant had already received any relief to which he would ordinarily have been entitled as a result of any misconduct on the part of the State.

**6. Constitutional Law—right to trial—threat of death penalty—coercion of guilty plea—withholding critical information**

The trial court erred by concluding that the State's use of the threat of the death penalty as leverage to coerce defendant into entering a guilty plea and waiving his constitutional right to trial, while simultaneously withholding critical information to which defendant was statutorily and constitutionally entitled, constituted a flagrant violation of defendant's constitutional rights. The record contained sufficient evidence to establish that the State was entitled to pursue defendant's case capitally and the results of a witness's polygraph examination were not discoverable.

Appeal by the State from order entered 10 December 2010 by Judge Orlando F. Hudson, Jr., in Durham County Superior Court. Heard in the Court of Appeals 22 February 2012.

*Attorney General Roy Cooper, by Senior Deputy Attorney General William P. Hart, Sr., Assistant Attorney General Daniel P. O'Brien, and Assistant Attorney General Derrick C. Mertz, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Daniel K. Shatz, for Defendant-Appellee.*

ERVIN, Judge.

The State appeals from an order granting Defendant Derrick Allen's motion to dismiss with prejudice the first degree murder, felony child abuse and first degree statutory sex offense charges that had been lodged against him. On appeal, the State contends that the trial court erred by: (1) making certain findings of fact which lacked adequate evidentiary support; (2) concluding that Defendant's constitutional rights had been violated and that dismissal was the appro-

priate remedy for these violations pursuant to N.C. Gen. Stat. § 15A-954(a)(4); and (3) concluding that the State had violated applicable discovery requirements and that dismissal was the appropriate remedy for these violations pursuant to N.C. Gen. Stat. § 15A-910. After careful consideration of the State's challenges to the trial court's order in light of the record and the applicable law, we conclude that the trial court's order should be reversed.

## I. Factual Background

### A. The Death of Ava[1]

In February 1998, Defendant lived with his girlfriend, Diane Jones, and Ms. Jones' two-year old daughter, Ava. On the morning of 9 February 1998, Ms. Jones left for work, leaving Defendant and Kia Ward to care for Ava. About 30 minutes after Ms. Ward's departure, Defendant telephoned 911 and indicated that Ava was unresponsive. A short time later, emergency medical personnel arrived and attended to Ava, who had no pulse and had what appeared to be a small amount of blood on the inside left leg of her sleepsuit. According to Defendant, Ava had complained of leg pain and became unresponsive following her removal from the bathtub.

Ava was taken to a nearby emergency room, where attempts to revive her proved unsuccessful. An examination of Ava's body by the attending physician revealed a "fresh noticeable tear in [Ava's vagina with] . . . some blood [being] found inside the vagina and on the clothes [Ava] wore to the hospital." An emergency room nurse reported that, after Ava had been pronounced dead, Defendant had been looking at Ava's vaginal area.

A subsequent autopsy revealed abrasions or lacerations to Ava's vaginal orifice, including a "focal hemorrhage[,]" coupled with subdural and subarachnoid hemorrhaging of the brain, moderate cerebral edema, epidural and subarachnoid hemorrhaging of the spinal column, and bilateral retinal hemorrhaging. The medical examiner concluded that Ava's death resulted from shaken baby syndrome.

On that same date, Defendant was arrested and charged with first degree sexual offense. On 16 February and 2 March 1998, the Durham County grand jury returned bills of indictment charging Defendant with first degree sex offense, felony child abuse, and first degree murder.

---

1. Ava is a pseudonym used for the purpose of protecting the privacy of the minor victim and for ease of reading.

## B. Investigation

### 1. Blood Testing

Investigator Grant Gilliam of the Durham Police Department submitted a number of items to the SBI for examination. Special Agent Jennifer Elwell of the SBI analyzed these items for the presence of blood and stated that testing performed on stains found on a single pair of Ava's "training pants," or underwear, and two of Ava's "sleeper[s,]" was positive, or "[i]n other words, [that the] sample exhibited chemical properties consistent with what [she] would see in a bloodstain."[2] In addition, Special Agent Elwell conducted a Takayama test, which she described as a "confirmatory blood test," on the sleepers and underwear which yielded "negative" results. As a result, Special Agent Elwell placed a "–" adjacent to the word "Takayama" in her lab notes with respect to each tested item.

According to Special Agent Elwell, when one performed a Takayama test, "[y]ou were looking specifically for a crystal kind of formation that would occur" and, "[i]f the crystals didn't appear, then you would say that the test was negative" or, in some instances, inconclusive. A negative Takayama test result "only means that [the analyst] was not able to see a crystal formation . . . with this test." Although Special Agent Elwell's laboratory notes contained the "–" notation," her report made no reference to the Takayama results and merely stated that the sleepers and the underwear "gave chemical indications for the presence of blood." When asked to justify the wording of her report, Special Agent Elwell testified that, "[w]hen [the] Takayama worked, it was very good[;]" that, "if the Takayama test did not work, that did not mean that blood wasn't present on [the] sample[;]" and that, in instances involving negative Takayama results, the SBI's practice was to simply report the last valid test result without further comment. Special Agent Elwell did not perform DNA analysis on the sleepers and underwear on the grounds that DNA evidence was useful in cases involving "some sort of a transfer between a victim and a suspect;" that there was no reason to believe that such a transfer had occurred in this instance; and that "we cannot put a . . . time stamp on a bloodstain."

---

2. Ava was wearing one of the two sleepers when emergency medical personnel arrived at the residence. The training pants and the second sleeper were recovered from the bathroom in which Defendant allegedly assaulted Ava.

### 2. Ms. Ward's Interview and Statement

On 10 February 1998, Ms. Ward gave investigating officers a written statement. According to her statement, Ms. Ward awoke at around 10:00 a.m. and cared for Ava until Defendant woke up about an hour later. Ms. Ward said that Defendant became frustrated with Ava for wetting her clothes, took her into the bathroom, bathed her, and spanked her. After Defendant dressed Ava, the two of them returned to the bathroom, at which point Ms. Ward "could hear [Defendant] fussing about [Ava using] the bathroom on herself." As Defendant left the bathroom with Ava on his shoulder, Ms. Ward noticed that Ava was "shaking - almost like she was having a seizure. . . . " When Ms. Ward asked what was wrong, Defendant responded that "[Ava] was on [his] back . . . [while he] was giving her a piggy-back ride, and she fell."

After subsequently hearing a noise, Ms. Ward went into Ava's room, where she observed Defendant sitting in the floor, changing Ava's underwear, and "mumbl[ing] something—like they [are] dirty or . . . tight." When Defendant asked Ms. Ward if she had noticed that Ava had been limping, Ms. Ward responded in the affirmative. At that point, Defendant picked Ava up, took her into Ms. Jones' room, and placed her on the bed. Ms. Ward left the home at around 2:00 p.m.

On 28 February 1998, Investigator Gilliam requested that Special Agent Mike Wilson of the SBI conduct a polygraph examination of Ms. Ward in which he asked her the following questions: "(1) [d]id you insert any object into the vagina of [Ava]?[;] (2) [d]id you shake [Ava]?[;] (3) [have] you been truthful with Investigator [] Gilliam?[;] [and] (4) [h]ave you been truthful with [m]e, the [p]olygraph [o]perator?" At the ensuing polygraph examination, Special Agent Wilson had the following exchange with Ms. Ward: "[Q:] Did you shake [Ava]? Response: No[;] Q: Did you intentionally hurt [Ava]? Response: No[;] Q: Did you cause the death of [Ava]? Response: No." "Based upon the results of this examination, [Special Agent Wilson concluded] that [Ms. Ward] was not deceptive regarding these questions."

On the same day, Investigator Gilliam questioned Ms. Ward, who stated that she had smelled marijuana "coming from the back room that morning before [Defendant] came out to where [Ava] and [Ms. Ward] were." Although Ms. Ward admitted that she smoked marijuana, she declined Defendant's invitation to "hit this" because she "wanted to be clear when [her] grandmother . . . got there" and denied having consumed any marijuana on either the day before or the day

of Ava's death. In addition, although Ms. Ward acknowledged having had sexual intercourse with Defendant two summers earlier, she had not had any such contact with Defendant since that time and had "kind of been like enemies" with Defendant in more recent times.

### C. Capital Certification

On 2 April 1998, the State filed a notice that it intended to prosecute Defendant capitally. On 6 July 1998, a Rule 24 conference was conducted before Judge Henry Hight, who determined that the State was entitled to seek the death penalty against Defendant.

### D. Discovery Hearing

Defendant's trial counsel filed numerous pre-trial motions, including a motion to preserve evidence, a motion for discovery, a motion for the production of prior written statements by State's witnesses, a motion for the production of statements by witnesses that the State did not intend to call at trial, a motion for the production of exculpatory evidence, a motion that written reports be provided by the State's experts, and a motion to produce data, tests, procedures, and diagrams. On 4 March 1999, a hearing concerning pending pretrial motions was held before Judge David Q. LaBarre. At the conclusion of that hearing, Assistant District Attorney Freda Black made notes to the effect that Judge LaBarre had "allowed" the motion for the production of exculpatory evidence and that the State had an "ongoing obligation" to disclose such evidence. In addition, Ms. Black noted that the State did not have (1) "any statement of any witness or from any source, exculpating the [D]efendant or otherwise indicating a lessened role of the [D]efendant in [the] case[;]" (2) "any evidence of any mental or emotional illness or drug or alcohol use by any of the prosecution witnesses at the time of [the] offense or any time thereafter[;]" and (3) the "names and addresses of any individuals who were considered at any time during the case as possible suspects . . . [.]"

On 22 March 1999, Judge LaBarre entered a written order which, among other things, (1) granted Defendant's motion for production of exculpatory evidence; (2) granted Defendant's motions that the State be required to provide written reports from its expert witnesses and any relevant data, test procedures and diagrams; (3) denied Defendant's motion for prior written or recorded statements made by the State's witnesses; and (4) denied Defendant's motion for the production of statements by witnesses whom the State did not intend to call at trial. After the hearing, the State filed a "response to Defendant's request for voluntary discovery" stating that the State was pro-

viding the "rough notes" of the SBI's investigation, which included Special Agent Elwell's lab notes containing the "–" notation adjacent to "Takayama."

### E.  Defendant's *Alford* Pleas

On 18 August 1999, Ms. Black wrote Defendant's trial counsel for the purpose of indicating that a plea offer that the State had already made constituted the State's "bottom line" and voluntarily disclosing two additional statements by Ms. Ward which inculpated Defendant in Ava's death. On 26 August 1999, Defendant entered *Alford* pleas to first degree sexual offense and second degree murder before Judge A. Leon Stanback. In return for Defendant's pleas, the State dismissed the felony child abuse charge that had previously been lodged against Defendant and did not seek to have him convicted of first degree murder. At Defendant's plea hearing, Ms. Black made a factual basis statement which included (1) a summary of Ms. Ward's statement concerning the events of 9 February 1998; (2) a recitation of the nurse's comments concerning Defendant's behavior at the emergency room; and (3) an assertion that "the most significant item . . . found [by officers at Ms. Jones' home] was a pair of [Ava's] bloody [underwear] on the floor of the bathroom . . . ." At the conclusion of the plea hearing, Judge Stanback sentenced Defendant to a term of 237 to 294 months imprisonment based upon his conviction for second degree murder and to a consecutive term of 288 to 355 months imprisonment based upon his conviction for first degree sexual offense.

### F.  Withdrawal of Defendant's Guilty Pleas

On 27 January 2004, Defendant filed a *pro se certiorari* petition with this Court challenging his convictions. On 10 February 2004, this Court allowed Defendant's *certiorari* petition and remanded this case to Durham County Superior Court for resentencing. On 4 September 2007, Defendant filed a motion for appropriate relief requesting that the judgments in his case be vacated and that he be allowed to withdraw his guilty pleas because Judge Stanback had (1) sentenced Defendant in the aggravated range based upon his second degree murder plea despite the absence of any evidence tending to show the existence of an aggravating factor and (2) sentenced Defendant as a prior record level II without adequate proof of his criminal history. On 19 March 2009, the trial court entered an order vacating Judge Stanback's judgments and granting Defendant's motion to withdraw his guilty pleas.

## G. Additional Discovery

On 18 February 2010, Lisa A. Williams was appointed to represent Defendant. On 13 and 15 April 2010, Ms. Williams inspected what was alleged to be the complete files relating to Defendant's case in the possession of the Durham County District Attorney's Office. At the conclusion of her inspection, Ms. Williams wrote to Assistant District Attorney T. Mitchell Garrell for the purpose of indicating her belief that she had not been provided with an opportunity to inspect the State's complete files and requesting that she be provided with specific information that she believed to be missing from the State's files, including pages 63 through 86 of Investigator Gilliam's supplemental report.

After the State provided the missing pages from Investigator Gilliam's report on 10 July 2012, Ms. Williams concluded that certain information contained in that material had not been previously provided to Defendant, including the results of Ms. Ward's 7 April 1998 polygraph examination, Special Agent Wilson's statement concerning Ms. Ward's polygraph examination, and the transcript of Investigator Gilliam's interview with Ms. Ward. As a result, Defendant filed several discovery-related motions, including: (1) a 27 July 2010 motion for discovery; (2) a 27 July 2010 motion to compel the investigating officers to turn over all information relating to Defendant's case; (3) a 28 July 2010 motion for disclosure concerning any tests that had been performed and any data that had been developed during the testing process; (4) a 9 September 2010 motion that the identity of the information provided by the prosecutor pursuant to an open file policy be memorialized in writing; (5) a 9 September 2010 motion to compel the disclosure of certain specific items of evidence; and (6) a 2 November 2010 motion to compel discovery. The State consented to the entry of orders requiring that responses to all discovery requests submitted by Defendant be provided prior to 10 December 2010.

## H. Swecker-Wolf Report

In August 2010, the Attorney General's Office released the Swecker-Wolf report, an independent review of the SBI crime laboratory. According to the Swecker-Wolf Report, an SBI "policy issued in 1997 [and remaining in effect until 19 March 2001] specifically guided serology [a]nalysts to report only the results of positive presumptive tests for blood even though one or more confirmatory tests[, such as a Takayama test,] were recorded as inconclusive in their lab notes." Under established SBI policy, when "a presumptive test for the pres-

ence of blood . . . was positive but confirmatory tests yield[ed] 'inconclusive results . . . [,]' " the laboratory report should read that the examination " 'revealed chemical indications for the presence of [blood,]' " and "[n]egative test results were to be reported as 'failed to reveal the presence of blood.' " In the opinion of the authors of the Swecker-Wolf Report, "this reporting method failed to adequately place the reader on notice as to the existence of subsequent tests[,]" had "the potential to be material to the preparation of a defense to charges where the presence of blood was a central issue[,]" and could "lead to violations of *Brady* and/or North Carolina Discovery rules if the presence of blood was a central issue in deciding the guilt or innocence of the defendant and/or material to the preparation of a defense . . . ." The Swecker-Wolf Report listed Special Agent Elwell's report in Defendant's case as one of a number of reports that "overstate[d] or incorrectly report[ed] test results" because it "[did] not reflect the negative confirmatory tests results." On the other hand, the Swecker-Wolf Report concluded that "[n]o evidence was found that laboratory files or reports were concealed or evidence deliberately suppressed" given that "[a]nyone with access to the lab notes could discover the discrepancies and omissions described in [the] report."

## I.  Continuing Discovery Issues and Motion to Dismiss

On 12 October 2010, the trial court entered orders granting Defendant's motions seeking (1) the disclosure of concessions or deals between the State and potential witnesses; (2) to have investigating officers compelled to turn over all information in their possession to the prosecutor; (3) to have open file discovery provided pursuant to N.C. Gen. Stat. § 15A-903; (4) to have portions of the 4 March 1999 discovery order which were inconsistent with current discovery statutes vacated; and (5) to memorialize the discovery provided to Defendant pursuant to the open file discovery process and various orders of the court and to have the State directed to "timely comply" with all orders entered by the trial court. On 12 October 2010, Defendant filed a motion seeking the dismissal of the charges that had been lodged against him on the grounds that (1) the State "knew or should have known that the written conclusion contained in [Special Agent Elwell's] lab report contained false, misleading, and incomplete information[;]" (2) the State had failed to disclose information concerning Ms. Ward's polygraph examination in a timely manner; (3) the State had failed to treat Ms. Ward as a suspect in Ava's death; and (4) several key items of evidence that were once in exis-

tence had been destroyed or lost, including all physical specimens and samples taken from Ava's body. The State, through either Mr. Garrell or District Attorney Tracey Cline, who had assisted Ms. Black during earlier stages of this proceeding, consented to the allowance of all discovery requests that were submitted by Ms. Williams prior to 10 December 2010. On 2 November 2010, Defendant filed a motion to compel discovery in which he contended that the disclosures made by the State on 21 October 2010 did not contain certain previously-requested items, including: (1) a master copy or original form of the 911 calls and police traffic communications related to Defendant's case; (2) the handwritten notes that had previously been provided to Judge LaBarre for *in camera* inspection; (3) any indication as to what, if any, evidence obtained from Ava's body had been lost or destroyed during the previous twelve years; (4) Ava's medical records; (5) reports prepared by and curriculum vitae for any expert used or consulted by the State, including Special Agent Elwell, Special Agent David Spittle of the SBI, Special Agent Wilson, and the medical examiner who conducted Ava's autopsy; (6) the underlying data generated in connection with Special Agent Wilson's polygraph examination of Ms. Ward; (7) the SBI and Durham Police Department manuals governing the reports generated with respect to the polygraph examination of Defendant; (8) information concerning Ernesto Allen, an alternate suspect who was no longer alive; and (9) the State's file relating to a small child's contention that she had been molested at a time when Defendant was incarcerated.

On 18 November 2010, Defendant filed an affidavit executed by Ms. Williams and certain attachments indicating the extent to which discovery had been provided in a digital format. According to this affidavit, the State had provided information which was not located in what had been represented to be the State's entire files in the discovery disclosure made on 21 October 2010. In addition, Ms. Williams also indicated that the document tendered to the trial court by the State to memorialize the discovery provided to Defendant contained new information which had not been previously provided to Defendant and omitted information that had been previously provided during the discovery process.

After both the State and Defendant agreed that Defendant's dismissal motion would be heard on 9 December 2010, Ms. Williams indicated that Defendant would need to receive responses to the dismissal motion and the discovery requests sufficiently in advance of the hearing to permit adequate preparation. Based on representations

made by Ms. Cline, the trial court entered an order on 29 November 2010 requiring the State to file a response to Defendant's dismissal motion and to comply fully with Defendant's discovery requests (or explain its inability to do so) by 1:00 p.m. on 1 December 2010. On 1 December 2010, Mr. Garrell filed a response to Defendant's dismissal motion. On 8 December 2010, Ms. Cline directed Mr. Garrell to make a discovery disclosure to Defendant regarding the practices and procedures utilized by the SBI laboratory. Ms. Williams accepted service of this disclosure on 9 December 2010, the date of the hearing on Defendant's dismissal motion.

Defendant's dismissal motion came on for hearing before the trial court at the 9 December 2010 session of Durham County Superior Court. After hearing testimony from Ms. Cline, Ms. Black, Special Agent Wilson, Special Agent Elwell, Investigator Gilliam, and other witnesses, the trial court dismissed the charges against Defendant with prejudice "due to the failure [by the State] to disclose exculpatory information to the [D]efendant, . . . in a manner that allowed for the protection of his constitutional rights . . . ." On 10 December 2010, the trial court entered a written dismissal order which concluded, in pertinent part, that (1) the State's failure to provide an "honest lab report documenting the negative results of confirmatory blood testing . . . [;]" (2) the State's provision of "a deceptively written report designed to obscure the fact that confirmatory blood testing" had been performed and "yielded negative results[;]" (3) the State's failure to provide "the statement given by [Ms.] Ward in which [she] acknowledges a prior sexual relationship with [Defendant], acknowledges that she subsequently considered him an enemy, and . . . admitted smoking marijuana around the time [of Ava's death]; (4) the State's failure to provide Defendant "with information regarding systemic problems within the SBI laboratory which demonstrated the pro[-]prosecution bias of its [a]gents . . . [and] impeached the credibility of its [a]gents['] reports;" (5) the State's conduct in "fraudulently inducing [Defendant] "to waive his constitutional right to a jury trial;" (6) the State's "intentional misrepresentation of material fact to the Court at [Defendant's] plea hearing[;]" and (7) "[t]he State's use of the threat of the death penalty as leverage to coerce [Defendant] into entering a guilty plea . . . while simultaneously withholding critical information" which Defendant was entitled to receive "flagrantly violated" Defendant's constitutional rights and that each of these violations, considered separately, had "caused such irreparable prejudice" as to necessitate the dismissal of the charges that had

been lodged against him. In addition, the trial court concluded that (1) the State's "failure to fully and completely report the results of the blood testing performed by [Special] Agent Elwell" and (2) the State's failure to "report the results of the polygraph testing [of Ms. Ward]" violated Defendant's statutory discovery rights and that each of these violations, considered separately, necessitated the dismissal of the charges that had been lodged against Defendant. The State noted an appeal to this Court from the trial court's order.

## II. Legal Analysis

### A. Standard of Review

"In reviewing a trial judge's findings of fact, we are 'strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law.' " *State v. Williams*, 362 N.C. 628, 632, 669 S.E.2d 290, 294 (2008) (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)).

> The classification of a determination as either a finding of fact or a conclusion of law is admittedly difficult. As a general rule, however, any determination requiring the exercise of judgment, . . . or the application of legal principles, . . . is more properly classified a conclusion of law.

*In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997) (citation omitted and quoting *Quick v. Quick*, 305 N.C. 446, 452, 290 S.E.2d 653, 657–58 (1982)). "A trial court's 'mislabeling' a determination, however, is 'inconsequential' as the appellate court may simply re-classify the determination and apply the appropriate standard of review." *State v. Hopper*, 205 N.C. App. 175, 179, 695 S.E.2d 801, 805 (2010) (citation omitted).

### B. Findings of Fact

[1] As an initial matter, we note that the State contends that several of the trial court's findings of fact lack adequate evidentiary support. Based upon its belief that "it is difficult . . . to fully apprise [the] Court of the totality of [the] factual and legal errors contained in [the trial court's] [o]rder" given the page limits applicable to briefs filed in this Court, the State has provided a list of allegedly unsupported findings of fact which includes Finding of Fact Nos. 20, 23(a), 55, 61, 68, 70-71, 75, 82(q), 87(a)-(i), 87(k)-(m), 87(o)-(r), 87(t)-(y), 88(d), 90, 92-96,

100, 104-108, 110-116, 119, 121, 127-129, 132-135, 138-139, 141-142, 144-150, and 152-157 in its brief. However, given that the State has only advanced arguments directed to the sufficiency of the evidentiary support for a limited number of these findings, we conclude that the State has abandoned its challenges to the remaining findings, which will be deemed binding for purposes of appellate review. *State v. McLeod*, 197 N.C. App. 707, 711, 682 S.E.2d 396, 398 (2009) (stating that "[u]nchallenged findings of fact . . . are presumed to be supported by competent evidence and [are] binding on appeal") (citation, brackets, and quotation marks omitted)). We will address the State's remaining challenges to certain of the trial court's findings at the appropriate point in this opinion.

### C. Alleged Constitutional Violations

### 1. N.C. Gen. Stat. § 15A-954(a)(4)

N.C. Gen. Stat. § 15A-954(a)(4) provides, in pertinent part, that "[t]he court on motion of the defendant must dismiss the charges stated in a criminal pleading if it determines that: . . . [(1)] [t]he defendant's constitutional rights have been flagrantly violated and [(2)] there is such irreparable prejudice to the defendant's preparation of his case that there is no remedy but to dismiss the prosecution." "As the movant, [the] defendant bears the burden of showing the flagrant constitutional violation and . . . irreparable prejudice to the preparation of his case." *Williams*, 362 N.C. at 634, 669 S.E.2d at 295. N.C. Gen. Stat. § 15A-954(a)(4) " 'contemplates drastic relief,' such that 'a motion to dismiss under its terms should be granted sparingly.' " *Id.* (quoting *State v. Joyner*, 295 N.C. 55, 59, 243 S.E.2d 367, 370 (1978)). "The decision that [a] defendant has met the statutory requirements of [N.C. Gen. Stat.] § 15A–954(a)(4) and is entitled to a dismissal of the charge against him is a conclusion of law" subject to *de novo* review. *Id.* at 632, 669 S.E.2d at 294. As a result of the fact that the trial court found that each of the alleged constitutional violations sufficed to justify the dismissal of the charges that had been lodged against Defendant, we must review the State's challenges to each of the alleged violations set out in the order to determine whether the trial court's order should be sustained on appeal.

### 2. *Brady*

As an initial matter, the State contends that the "trial court erred in making findings and conclusions that [D]efendant's constitutional rights to due process as outlined in *Brady v. Maryland*[, 373 U.S. 83,

83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] and its progeny were violated." The State's contention has merit.

In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. at 1196-97, 10 L. Ed. 2d at 218. The State is required to disclose information under *Brady* even in the absence of a request, *Strickler v. Greene*, 527 U.S. 263, 280, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286, 301 (1999), including evidence "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 1568, 131 L. Ed. 2d 490, 508 (1995). "To establish a *Brady* violation, a defendant must show (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *State v. McNeil*, 155 N.C. App. 540, 542, 574 S.E.2d 145, 147 (2002) (citation omitted), *disc. review denied*, 356 N.C. 688, 578 S.E.2d 323 (2003); *see also Strickler*, 527 U.S. at 281-82, 119 S. Ct. at 1948, 144 L. Ed. 2d at 302.

"Evidence favorable to an accused can be either impeachment evidence or exculpatory evidence." *Williams*, 362 N.C. at 636, 669 S.E.2d at 296 (citing *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481, 490 (1985)). "[E]xculpatory evidence is 'evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed.' " *State v. Lewis*, ____ N.C. ____, ____, 724 S.E.2d 492, 501 (2012) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413, 420 (1984)), or "[e]vidence tending to establish a criminal defendant's innocence." *Black's Law Dictionary* 577 (7th ed. 1999). On the other hand, impeachment evidence has been defined as "[e]vidence used to undermine a witness's credibility[,]" *Black's Law Dictionary* 578 (7th ed. 1999), with "[a]ny circumstance tending to show a defect in the witness's perception, memory, narration or veracity [] relevant to this purpose." *State v. Ward*, 338 N.C. 64, 97, 449 S.E.2d 709, 727 (1994) (citation and quotation marks omitted), *cert. denied*, 514 U.S. 1134, 115 S. Ct. 2014, 131 L. Ed. 2d 1013 (1995).

"Evidence is considered 'material' if there is a 'reasonable probability' of a different result had the evidence been disclosed." *State v. Berry*, 356 N.C. 490, 517, 573 S.E.2d 132, 149 (2002) (citation omitted). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383,

87 L. Ed. 2d at 494. The defendant bears the burden of proving that undisclosed evidence was material. *State v. Tirado*, 358 N.C. 551, 589-90, 599 S.E.2d 515, 541 (2004) (citation omitted), *cert. denied sub. nom Queen v. North Carolina*, 544 U.S. 909, 125 S. Ct. 1600, 161 L. Ed. 2d 285 (2005).

In challenging the trial court's order, the State contends that, since *Brady* is a trial right and since "[D]efendant has never . . . had a trial [and is currently awaiting trial], the State could not have violated his constitutional rights to due process of law . . . ." As the State suggests, the Supreme Court has recognized that "due process and *Brady* are satisfied by the disclosure of the evidence at trial, so long as disclosure is made in time for the defendant[] to make effective use of the evidence." *State v. Taylor*, 344 N.C. 31, 50, 473 S.E.2d 596, 607 (1996) (citation omitted). In addition, the United States Supreme Court has held that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *United States v. Ruiz*, 536 U.S. 622, 633, 122 S. Ct. 2450, 2457, 153 L. Ed. 2d 586, 597 (2002).[3] Although neither the United States Supreme Court nor the appellate courts in this jurisdiction has directly addressed the extent to which prosecutors have a *Brady*-related obligation to disclose exculpatory evidence prior to entering into a plea agreement with a defendant, we need not decide this issue given the procedural posture in which we find ourselves in this case and the nature of the undisclosed evidence at issue here.[4]

---

3. According to Defendant, *Ruiz* merely stands for the proposition that "it is not unconstitutional for the government to negotiate a waiver of the defendant's right to receive impeaching evidence as part of a plea agreement." While *Ruiz* does resolve this narrow issue, it also addressed "whether the Constitution requires . . . pre[-]guilty plea disclosure of impeachment information" and concluded that "it does not." 536 U.S. at 629, 122 S. Ct. at 2455, 153 L. Ed. 2d at 595.

4. In his brief, Defendant contends that *Williams* expressly rejected the argument "that *Brady* is only a trial right." However, we do not read *Williams* as broadly as Defendant. In *Williams*, the State admitted during a pretrial hearing to the "existence, possession, and destruction of material evidence favorable to [the] defendant and acknowledged that it was impossible to produce the evidence at that time or, by implication, at any future trial." 362 N.C. at 629, 669 S.E.2d at 292. Although the Supreme Court did disagree with the State's contention that *Brady* "only require[d] the State to turn over evidence at trial," *Id.* at 637, 669 S.E.2d at 297, it narrowly tailored its holding to the factual circumstances present there by concluding that a trial judge need not wait to dismiss a pending case where the State had "ma[de] a pretrial admission to the existence and destruction" of *Brady* evidence and acknowledged that it was "impossible to produce the evidence at that time or, by implication at trial. . . ." *Id.* at 638, 669 S.E.2d at 298 (emphasis omitted). In this case, on the other hand, Defendant is in possession of the evidence upon which his *Brady* claim is predicated, so we do not find *Williams* controlling.

### a. Ms. Ward's Polygraph Examination and Statements

[2] On appeal, the State contends that the trial court erred by concluding that the State flagrantly violated Defendant's *Brady* rights, both prior to the entry of his plea and prior to the hearing on Defendant's dismissal motion, by failing to disclose, in a timely manner, (1) the fact that Ms. Ward had taken a polygraph examination; (2) the results of Ms. Ward's polygraph examination; and (3) the fact that Ms. Ward told Investigator Gilliam that she had previously used marijuana, had had sex with Defendant, and considered him an enemy. We agree.

The trial court found as a fact that Ms. Ward was a critical witness for the State; that, if her testimony was to be believed, a "[t]rier of fact could conclude that [Defendant] inflicted [Ava's] injuries;" and that, in the event that Ms. Ward's testimony was not believed, that fact would render her a prime suspect or create the possibility that a third person, such as Ernesto Allen, had killed Ava. In addition, the trial court found that Ms. Ward's statement was material because it "impeached [her] credibility;" that the State's failure to provide this statement was "aggravated by the fact that[,] when Judge LaBarre ordered the disclosure of any *Brady* material," Ms. Black responded that the State had no evidence that any witness had been using drugs; and that, had Defendant known that Ms. Ward had taken a polygraph examination, he would have known that the State viewed Ms. Ward's credibility as suspect and declined to accept the State's plea offer.[5] Assuming, without deciding, that the trial court's findings to the effect that the State willfully and intentionally failed to disclose evidence relating to Ms. Ward's polygraph examination and her 7 April 1998 statement to Investigator Gilliam have adequate evidentiary support, we are still compelled to hold that the failure to disclose this evidence did not violate *Brady*.

Although we agree with the trial court that the polygraph report and Ms. Ward's statement tended to undermine her credibility and did, for that reason, have impeachment value,[6] the State is not con-

---

5. As a result of the fact that certain of the trial court's "findings" involve the application of legal principles to facts, they are more properly termed "conclusions of law," *Helms*, 127 N.C. App. at 510, 491 S.E.2d at 675, and will be reviewed accordingly. *Hopper*, 205 N.C. App. at 179, 695 S.E.2d at 805.

6. Although the relevant findings are not entirely clear, we do not believe that the trial court concluded that the undisclosed information had independent exculpatory value given that none of the undisclosed information appears to have any evidentiary value aside from its tendency to impeach the credibility of Ms. Ward's testimony.

stitutionally required to disclose material impeachment evidence prior to the defendant's decision to enter a guilty plea. *Ruiz*, 536 U.S. at 633, 122 S. Ct. at 2457, 153 L. Ed. 2d at 597. In addition, given that Defendant's guilty pleas were subsequently vacated and given that the State provided the relevant information to Defendant approximately six months prior to the hearing on his dismissal motion, Defendant received the evidence in question at a time when he had "ample opportunity" to make effective use of it. *Taylor*, 344 N.C. at 50, 473 S.E.2d at 607 (concluding that no *Brady* violation occurred given that the defendants received the evidence in question four days before the State rested its case and did not seek a continuance). As a result, we conclude that the trial court erred by determining that Defendant's *Brady* rights were "flagrantly violated" by the State's failure to disclose the polygraph report[7] and Ms. Ward's statements.

### b.  Special Agent Elwell's Report

**[3]**  Secondly, the State contends that the trial court erroneously concluded that the State flagrantly violated Defendant's *Brady* rights by "willful[ly] fail[ing] to provide . . . an accurate, honest lab report documenting the negative results of confirmatory blood testing on [Ava's] panties and sleepwear" and by providing Defendant "with a deceptively written report designed to obscure the fact that confirmatory blood testing was performed on [Ava's] panties and sleepwear and yielded negative results." More specifically, the State contends that (1) no *Brady* violation occurred because Defendant's case had yet to go to trial; (2) Defendant, through reasonable diligence, could have obtained the results of the Takayama tests by examining the lab notes that had been provided to him; (3) the absence of blood on Ava's underwear and sleepers did not constitute "exculpatory" or "material" evidence; and (4), "[a]t the time the trial court dismissed the charges, before any scheduled trial, . . . [D]efendant, through counsel, thoroughly understood the full import of the information, all of which had been turned over to [him prior to the entry of his *Alford* pleas]." We find the crux of the State's argument persuasive.

---

7. In addition, we note that polygraph evidence is not admissible, even by stipulation of the parties, in this jurisdiction. *State v. Grier*, 307 N.C. 628, 645, 300 S.E.2d 351, 361 (1983). In light of that fact, the results of Ms. Ward's polygraph examination could not be considered "material" evidence for *Brady* purposes. *Wood v. Bartholomew*, 516 U.S. 1, 6, 116 S. Ct. 7, 10, 133 L. Ed. 2d 1, 7 (recognizing that "[d]isclosure of . . . polygraph results . . . could have had no direct effect on the outcome of trial [] because" those polygraph results were inadmissible at trial under state law), *r'hrg denied*, 516 U.S. 1018, 116 S. Ct. 583, 133 L. Ed. 2d 505 (1995).

**STATE v. ALLEN**

[222 N.C. App. 707 (2012)]

In its brief, the State challenges the trial court's findings that "[t]he lab reports concerning the testing for blood on the panties and sleepwear were intentionally prepared in an inaccurate, incomplete and . . . misleading manner;" that, "[i]n the absence of a positive confirmatory test, there is no scientifically sound basis to conclude that an item is blood;" that both the negative test results themselves and information that Special Agents Elwell and Spittle "were engaged in a pattern of misconduct by failing to disclose material information" concerning the testing results and preparing misleading reports constituted *Brady* material; and that Special Agent Elwell's laboratory report was written in accordance with an SBI policy that "had the systemic effect of deliberately concealing negative test results." In addition, the trial court found that the absence of an "English language narrative stating that a Takayama test [had been] conducted, that such [a] test yielded negative results, or even that a Takayama test is a confirmatory test for the presence of blood" meant that Special Agent Elwell's report "failed to convey to a reasonable non-scientist . . . the complete results of the tests" that she had performed. As a result of its factual findings that the record "contain[ed] inconsistent descriptions of the injury to" Ava's vagina; the fact that the available medical information did not conclusively indicate that a sexual assault had occurred or the time at which Ava's vaginal injuries had been inflicted; and the fact that the presence of blood on Ava's underwear would have been "a highly graphic and disturbing piece of evidence" that would have "severely prejudiced" Defendant at a capital sentencing hearing, the trial court determined that the negative Takayama results "constituted exculpatory material and impeachment material under *Brady*" and that the resulting due process violation "was not cured by providing the rough notes which failed to adequately convey the negative results of confirmatory testing for blood."[8] Assuming, without in any way deciding, that the trial court's findings concerning the motives with which various investigative officers acted have adequate record support, we still must hold that no *Brady* violation occurred given the record developed in this case.

As an initial matter, we note that the trial court's findings to the effect that (1) the relevant medical records and reports and Ava's

---

8. Once again, certain of the challenged findings are more properly termed "conclusions of law" and will be reviewed as such. Once again, certain of the challenged findings are more properly termed "conclusions of law" and will be reviewed as such. *Helms*, 127 N.C. App. at 510, 491 S.E.2d at 675; *Hopper*, 205 N.C. App. at 179, 695 S.E.2d at 805.

autopsy report contained conflicting and inconsistent information concerning the nature and extent of her vaginal injuries; (2) there was no evidence concerning the time at which Ava's vaginal injuries had been inflicted; and (3) ascertaining whether blood did or did not appear on Ava's underwear and sleepers would assist in determining the time at which Ava's vaginal injuries had been inflicted lack any record support. The emergency room doctor who attended to Ava indicated that she had "fresh" vaginal tearing and that there was blood located in her vaginal vault, injuries which "usually result[] from some type of sexual trauma." Ava's autopsy report confirmed that she had sustained an "abrasion/laceration" to her vaginal orifice and had experienced vaginal "hemorrhaging." We are unable to discern any material difference between the descriptions of Ava's vaginal injuries as a tear, abrasion, or laceration. In addition, we find no record support for the trial court's finding that Ava's vaginal injury appeared in a 6 o'clock to 9 o'clock position and, even if such evidence existed, we see no material distinction between that description of Ava's injuries and a statement that she had been injured at "approximately [the] 4 o'clock to 7 o'clock [position.]" Finally, as Special Agent Elwell testified, the SBI had no ability to "place a date or a time on a bloodstain" and could only "say that the blood matches somebody or doesn't match somebody, [leaving her with] no idea how the blood gets there." As a result, these components of the trial court's findings of fact lack adequate record support.

Secondly, we do not believe, given the record before the trial court in this case, that the undisclosed information constituted material exculpatory evidence for purposes of *Brady*. A thorough review of the record indicates no evidence that anyone involved in the underlying events other than Ava had been bleeding. In addition, the record contains ample evidence tending to show that Ava had sustained injuries to her vagina which resulted in bleeding aside from the test results. The emergency medical personnel who came to Ms. Jones' home and the emergency room physician who attended to Ava both noted the presence of blood on the sleeper that Ava had been wearing. An evidence technician who processed the home found what appeared to be blood on additional items of clothing. A paper towel recovered from a bedroom and a bath towel recovered from the living room tested positive for the presence of blood as confirmed by both the presumptive and Takayama tests. As we have already noted, the available testing techniques did not permit a determination of when any bloodstain ultimately determined to exist had been created. As a result, based upon our review of the record as a whole, we do

**STATE v. ALLEN**

[222 N.C. App. 707 (2012)]

not believe that the negative confirmatory test results would have had any material tendency to establish Defendant's innocence of the crimes with which he had been charged.

Thirdly, a number of federal circuits have recognized that, "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine." *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) (holding that a defendant was not entitled to *Brady* relief given that the defendant knew that a potential witness possessed possibly exculpatory information and could have questioned that witness prior to trial). The undisputed record evidence establishes that Defendant's trial counsel possessed the rough lab notes containing the "-" notation next to the "Takayama" reference and could, through independent investigation, have determined what this notation meant. *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980) (stating that, "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim"). As a result, even if the negative Takayama results had constituted material exculpatory evidence, Defendant still would not have been entitled to relief on *Brady*-related grounds.

Finally, as we have previously noted, Defendant has been allowed to withdraw his guilty pleas, which means that he occupies the position of a defendant awaiting trial rather than the position of a convicted criminal defendant. As of the date of the hearing concerning Defendant's dismissal motion, Defendant obviously knew the import of a negative Takayama result and could make effective use of that information at any subsequent trial. *See State v. Wise*, 326 N.C. 421, 429-30, 390 S.E.2d 142, 147 (holding that the State did not violate *Brady* by failing to disclose the results of a medical examination of the victim given that the defendant knew the examination results and could have subpoenaed the examining physician to testify at trial), *cert. denied*, 498 U.S. 853, 111 S. Ct. 146, 112 L. Ed. 2d 113 (1990). As a result, for all of these reasons, the trial court erred by concluding that the State had violated Defendant's *Brady* rights by failing to mention the Takayama testing in Special Agent Elwell's report and explain what those results meant.[9]

---

9. To the extent that the trial court concluded that the negative Takayama results constituted impeachment material, as compared to exculpatory evidence, we hold, consistent with *Ruiz*, that the State was not required to disclose these results prior to the entry of Defendant's guilty plea.

## c. Crime Laboratory Practices and Procedures

**[4]** In Conclusion of Law No. 4, the trial court determined that the State's failure to provide Defendant "with information regarding systemic problems within the SBI laboratory which demonstrated the pro-prosecution bias of its Agents as witnesses for the State and which impeached the credibility of its Agents['] reports of testing results" constituted a flagrant violation of Defendant's *Brady* rights. As the literal language of Conclusion of Law No. 4 recognizes, however, the information in question here tended, at most, to show that the SBI's analysts were biased in favor of the prosecution. As we have previously recognized, *Brady* does not require the disclosure of material impeachment evidence prior to the entry of a defendant's plea. *Ruiz*, 536 U.S. at 633, 122 S. Ct. at 2457, 153 L. Ed. 2d at 597. In addition, since Defendant clearly possessed the information in question prior to the hearing concerning his dismissal motion, "disclosure [was] made in time for . . . [D]efendant[] to make effective use of the evidence" at any trial that may eventually be held in this case. *Taylor*, 344 N.C. at 50, 473 S.E.2d at 607. As a result, the trial court erred by concluding that the State's failure to disclose information concerning the practices and procedures employed in the SBI laboratory constituted a *Brady* violation.

## 3. Factual Basis Statement

**[5]** Secondly, the State contends that the trial court erred by concluding that the State intentionally presented false evidence at Defendant's plea hearing by stating, during its factual basis showing, that there was blood on Ava's sleepers and underwear. More specifically, the State contends that (1) Ms. Black did not make any factual statement that did not rest on a reasonable inference drawn from the available evidence; (2) the extent to which blood was present on Ava's underwear and sleepers was not material; and (3) a negative Takayama result does not allow for a scientific conclusion that no blood is present. Once again, we conclude that the State's argument has merit.

In its order, the trial court found that, at the time that Defendant entered his negotiated guilty plea, Ms. Black "stated that one of the most important pieces of evidence for the State was the blood on [Ava's]" underwear. At the hearing on Defendant's dismissal motion, Defendant's Exhibit No. 26, a copy of Special Agent Elwell's phone log, was admitted into evidence. According to this phone log, Special Agent Elwell "gave [Ms. Black] the results [of her testing]" concern-

ing all of the evidence in the case on 18 August 1998. At that time, the two of them "discussed DNA [testing] and decided it wouldn't help prove anything at th[at] point[.]" When directly questioned concerning whether she had informed Ms. Black about the negative Takayama test results, Special Agent Elwell testified that she didn't "recall that conversation[.]" Similarly, Ms. Black testified that, although she could not remember discussing the test results with Special Agent Elwell, the general practice at that time was for analysts to provide prosecutors with test result information over the phone. However, Ms. Black also pointed out that "[t]hey didn't regularly give us notes back then," so the fact that she discussed the test results with Special Agent Elwell did "not mean that she gave me these [lab] notes [indicating the negative Takayama results]." Ms. Black denied knowing that Ava's underwear had "no blood and no semen on them" and stated that, if Special Agent Elwell had provided her with that information, she would have "never asserted to the Court . . . that there was blood on them."

In its brief, the State challenges the trial court's findings that Special "Agent Elwell informed [Assistant District Attorney] Black on August 18, 1998 that items on [Ava's] panties and sleepwear gave positive indications for the presence of blood based on a presumptive test and that subsequent confirmatory testing had failed to indicate blood was present on the same items;" that, contrary to Special Agent Elwell's testimony, "[I]nvestigator Gilliam did specifically request that . . . DNA testing [be performed] on various items submitted for analysis; that Ms. Black and Special Agent Elwell "decided to stop further testing of [these] items . . . because they believed further [DNA testing] would not prove inculpatory to [Defendant] and could possibly inculpate others;" and that Ms. Black knew when she made her factual basis statement at Defendant's plea hearing "that the [SBI] had determined that it could not conclude that there was blood on the panties" and intentionally provided false contrary information to Judge Stanback.[10]

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217, 1221 (1959) (citations omitted). A defendant is entitled to a new trial only "[i]f the false evidence is *material* in the sense that there is 'any reasonable likelihood that

10. Once again, although certain of the trial court's determinations are labeled as findings of fact, they really constitute conclusions of law and will be treated as such.

the false [evidence] could have affected the judgment of the jury[]' . . . ." *State v. Wilkerson*, 363 N.C. 382, 403, 683 S.E.2d 174, 187 (2009) (emphasis added) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342, 349-50 (1976)), *cert. denied*, ____ U.S. ____, 130 S. Ct. 2104, 176 L. Ed. 2d 734 (2010). Although the trial court's findings that Special Agent Elwell informed Ms. Black that stains on Ava's underwear gave positive indications for the presence of blood in preliminary testing and that subsequent confirmatory testing produced negative results have adequate record support, we hold that the trial court erred by concluding that Ms. Black made a material misstatement of fact at Defendant's plea hearing given that confirmatory testing results did not constitute "material" evidence. As we have previously determined, the absence of blood on Ava's underwear was not "material" given that (1) substantial independent evidence indicated that Ava was bleeding when she was transported to the emergency room; (2) no other individual involved in this case appears to have been bleeding; and (3) the available blood testing procedures do not permit an analyst to "date or time" a bloodstain. Furthermore, given that Defendant's guilty pleas have been vacated, Defendant has already received any relief to which he would ordinarily be entitled as a result of any misconduct on the part of the State. As a result, the trial court erred by concluding that the charges that had been lodged against Defendant should be dismissed based on the presentation of false information at the time of Defendant's initial plea hearing.

### 3. Use of Death Penalty to Induce Plea

**[6]** Thirdly, the State contends that the trial court erred by concluding that "the State's use of the threat of the death penalty as leverage to coerce [Defendant] into entering a guilty plea and waiving his constitutional right to trial, while simultaneously withholding critical information to which [Defendant] was statutorily and constitutionally entitled," constituted a flagrant violation of Defendant's constitutional rights. More specifically, the State argues that the record contains no evidence that the State sought the death penalty against Defendant "for leverage purposes or as a threat to the [D]efendant to improperly cause him to give up any constitutional right" and that the State did not act unlawfully by "pursuing [the] case as a capital case until [D]efendant entered a plea of guilty [without] disclosing all *Brady* material prior to that plea." Once again, we conclude that the State's argument has merit.

In its order, the trial court found as a fact that Ms. Black wrote to Defendant's counsel on 18 August 1999 for the purpose of conveying the State's "bottom line" plea offer. At that time, Ms. Black provided certain inculpatory information to Defendant's counsel for the purpose of inducing him to accept the State's offer. According to the trial court, the State's decision to withhold "numerous items of evidence to which [Defendant] was constitutionally entitled" and to "provid[e Defendant with] a deliberately deceptive lab report" while threatening him with execution resulted in the entry of an involuntary, fraudulently-induced, guilty plea and flagrantly violated Defendant's constitutional rights.[11]

"Plea bargaining flows from 'the mutuality of advantage' to defendants and prosecutors, each with his own reasons for wanting to avoid trial." *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S. Ct. 663, 668, 54 L. Ed. 2d 604, 611 (1978) (quoting *Brady v. United States*, 397 U.S. 712, 752, 90 S. Ct. 1463, 1471, 25 L. Ed. 2d 747, 758 (1970)). Although "confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'-and permissible-'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.' " *Id.* at 364, 98 S. Ct. at 668, 54 L. Ed. 2d at 611 (citations omitted and quoting *Chaffin v. Stynchcombe*, 412 U.S. 17, 31, 93 S. Ct. 1977, 1985, 36 L. Ed. 2d 714, 726 (1973)). As a result, no due process violation occurs simply because the prosecutor "openly present[s] the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution. . . ." *Id.* at 365, 98 S. Ct. at 669, 54 L. Ed. 2d at 612.

After carefully reviewing the record, we cannot conclude that the State "fraudulently induced [Defendant] to plead guilty" by "us[ing] the threat of the death penalty as leverage to coerce [Defendant] into entering a guilty plea and waiving his constitutional right to trial." As an initial matter, the record contains sufficient evidence to establish that the State was entitled to pursue Defendant's case capitally, as Judge Hight recognized when he issued his Rule 24 order. Secondly, the trial court appears to have relied upon a combination of the State's alleged misuse of the capital nature of Defendant's case and other alleged constitutional and statutory discovery violations in concluding that the charges against Defendant should be dismissed,

---

11. Once again, although certain of the trial court's statements are designated as findings of fact, they are actually conclusions of law and will be reviewed as such.

including the failure to disclose Ms. Ward's 7 April 1998 statement, the failure to disclose the results of Ms. Ward's polygraph examination, and the omission of the negative Takayama results from Special Agent Elwell's report. Having determined that the non-disclosure of these items did not constitute *Brady* violations, we are compelled to conclude that the trial court erred by determining that the State's decision to proceed against Defendant capitally coupled with the non-disclosure of these items constituted a flagrant violation of Defendant's constitutional rights. Thus, having determined that none of the constitutional grounds upon which the trial court predicated its decision to dismiss the charges lodged against Defendant have merit, we necessarily conclude that the trial court erred by determining that "[e]ach of the [constitutional] violations ha[d] individually caused such irreparable harm to [Defendant]'s case as to require a dismissal and . . . cumulatively caused such irreparable harm to [Defendant]'s case as to require a dismissal [pursuant to N.C. Gen. Stat. § 15A-954(a)(4)]."

### D. Statutory Discovery Violations

Next, the State contends that the trial court erred by concluding that Defendant's case should be dismissed with prejudice pursuant to N.C. Gen. Stat. § 15A-910 based on determinations that the State "willful[ly] fail[ed] to fully and completely report" (1) the results of the blood testing performed by Special Agent Elwell and (2) the results of Ms. Ward's polygraph examination. More specifically, the State contends that the trial court erred by (1) finding that Judge LaBarre specifically intended that "the parties use all due diligence and comply immediately" with the discovery order entered on 4 March 1999; (2) determining that the statements contained in Ms. Williams' affidavit were "truthful and accurate[;]" (3) shifting the burden of proof to the State; (4) finding that the State's actions were "intentional and willfully designed to give the State an advantage;" and (5) determining that Defendant had been irreparably prejudiced by the alleged discovery violations. After carefully reviewing the record, we hold that the trial court erroneously concluded that the State had violated the applicable discovery statutes.

### 1. Standard of Review

According to the version of N.C. Gen. Stat. § 15A-903(e), *repealed by* 2004 N.C. Sess. Laws Ch. 154, Sec. 4, at 517-20 (revising N.C. Gen. Stat. § 15A-903 to delete former N.C. Gen. Stat. § 15A-903(e) as part

of the enactment of open file discovery legislation), effective at the time of the 4 March 1999 discovery hearing:

> Upon motion of a defendant, the court must order the prosecutor to provide a copy of or to permit the defendant to inspect and copy or photograph results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case, or copies thereof, within the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecutor.

As a result, a criminal defendant is entitled "to pretrial discovery of not only conclusory laboratory reports, but also of any tests performed or procedures utilized by chemists to reach such conclusions" without the necessity for any showing "that such information [would] be material to the preparation of the defense or [was] intended for use by the State in its case in chief." *State v. Cunningham*, 108 N.C. App. 185, 195, 423 S.E.2d 802, 808 (1992).

According to N.C. Gen. Stat. §§ 15A-910(a)(3b) and (b), a trial judge who determines that a party has violated the statutory provisions governing discovery or a discovery order may "[d]ismiss the charge, with or without prejudice," after "consider[ing] both the materiality of the subject matter and the totality of the [surrounding] circumstances." However, "[i]f the court imposes any sanction, it must make specific findings justifying the imposed sanction." N.C. Gen. Stat. § 15A-910(d). Given that "[d]ismissal of charges is an 'extreme sanction' which should not be routinely imposed," *State v. Adams*, 67 N.C. App. 116, 121, 312 S.E.2d 498, 500 (1984), "orders dismissing charges for noncompliance with discovery orders preferably should [also] contain findings which detail the perceived prejudice to the defendant which justifies the extreme sanction imposed." *Id.* at 121-22, 312 S.E.2d at 501. A trial court's decision concerning the imposition of discovery-related sanctions pursuant to N.C. Gen. Stat. § 15A-910 may only be reversed based upon a "find[ing] [that the trial court] abuse[d] [its] discretion," *State v. Locklear*, 41 N.C. App. 292, 295, 254 S.E.2d 653, 656, *disc. review denied*, 298 N.C. 571, 261 S.E.2d 129 (1979), which means that the trial court's " 'ruling was so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Jones*, 151 N.C. App. 317, 325, 566 S.E.2d 112, 117 (2002) (quoting *State v. Carson*, 320 N.C. 328, 336, 357 S.E.2d

662, 667 (1987)), *appeal dismissed and disc. review denied,* 356 N.C. 687, 578 S.E.2d 320, *cert. denied,* 540 U.S. 842, 124 S. Ct. 111, 157 L. Ed. 2d 76 (2003).

### 2. Confirmatory Blood Testing Results

In its order, the trial court concluded that the State's failure to "fully and completely report" the results of the blood testing performed by Special Agent Elwell, including her failure to "properly report the confirmatory blood testing that yielded negative test results," constituted a violation of N.C. Gen. Stat. § 15A-903(e) sufficient to require dismissal pursuant to N.C. Gen. Stat. § 15A-910. After thoroughly reviewing the record, we conclude that the trial court erred in making this determination.

On 22 February 1999, Defendant filed a motion seeking the production of "[a]ll test procedures, test results, data compiled and diagrams produced" relating to the analyses performed by the SBI Crime Laboratory. In support of this request, Defendant asserted that Special Agent Elwell's laboratory report simply consisted of her analytical conclusions and that he was entitled to information concerning the testing procedures utilized and the data derived from those tests because, in the absence of such information, he would be unable to determine "what tests were performed, and whether the testing was appropriate, or to become familiar with the testing procedures." After a discovery hearing was held before Judge LaBarre and before Judge LaBarre entered an order granting Defendant's motion, the State filed a "response to Defendant's request for voluntary discovery" indicating that the "rough notes" of the SBI investigation, including Special Agent Elwell's lab notes, had been provided to Defendant.

In its order, the trial court found as fact that Special Agent Elwell's laboratory report did "not identify what test or tests were performed," "state that the test was only a preliminary test," or mention "that the State conducted confirmatory testing . . . that failed to confirm the presence of blood" on Ava's underwear; that Special Agent Elwell's report "obfuscated the test results," was "deceptive," and "was written in this manner" pursuant to an SBI policy that "had the systemic effect of deliberately concealing negative test results;" and that Special Agent Elwell's rough notes lacked an English language narrative explaining the nature of the confirmatory testing that had been conducted and the results of that confirmatory testing. Based upon these findings of fact, the trial court concluded that N.C. Gen. Stat. § 15A-903(e) required the State to affirmatively report and

explain the negative Takayama testing results and that the release of Special Agent Elwell's rough notes did not constitute sufficient compliance with the State's discovery obligations given the absence of adequate explanatory material. We do not find the trial court's logic persuasive.

As we have previously noted, SBI laboratory reports usually consist of conclusory statements which "reveal[] only the ultimate result[s] of the numerous tests performed by" the analyst and shed little light on "what tests were performed and whether the testing was appropriate, or [allowed them] to become familiar with testing procedures." *Cunningham*, 108 N.C. App. at 196, 423 S.E.2d at 809.

> Under our . . . [discovery] statutes and case law a defendant [was] entitled to the following discovery [pursuant to N.C. Gen. Stat. § 15A-903(e)]:
>
> 1. Results or reports of physical or mental examinations or of tests, measurements or experiments. N.C. Gen. Stat. § 15A-903(e).
>
> 2. Inspection, examination or testing of physical evidence by the defendant. *Id.*
>
> 3. Tests performed or procedures utilized by experts to reach their conclusions. *Cunningham*, 108 N.C. App. 185, 423 S.E.2d 802.
>
> 4. Laboratory protocol documents. *State v. Dunn*, 154 N.C. App. 1, 571 S.E.2d 650.
>
> 5. Reports documenting "false positives" in the laboratory results. *Id.*
>
> 6. Credentials of individuals who tested the substance. *Id.*

*State v. Fair*, 164 N.C. App. 770, 773-74, 596 S.E.2d 871, 873 (2004). We do not read *Cunningham*, Fair, or any other decision interpreting former N.C. Gen. Stat. § 15A-903(e) as requiring either an affirmative explanation of the extent and import of each test and test result, which would amount to requiring the creation of an otherwise nonexistent narrative explaining the nature, extent, and import of what the analyst did. Instead, our prior decisions concerning the State's disclosure obligations under former N.C. Gen. Stat. § 15A-903(e) contemplate the provision of information that the analyst generated during the course of his or her work.

As the record in this case clearly reflects, Defendant requested to receive "[a]ll test procedures, test results, data compiled and diagrams produced" in connection with the analyses conducted by the SBI laboratory. In response to Defendant's discovery request and Judge LaBarre's discovery order, the State provided Defendant with Special Agent Elwell's laboratory notes, which delineated the procedures she performed and the results that she developed during the course of her analysis, including a "-" notation beside the reference to "Takayama." With reasonable inquiry, Defendant's counsel could have determined what these notations meant. As the Swecker-Wolf report noted, "[a]nyone with access to the lab notes could discover the discrepancies and omissions described in [the laboratory] report." As a result, given that the materials provided to Defendant gave him the ability to "become familiar with the test[ing] procedures" and to determine "what tests were performed" and "whether the testing was appropriate," *Cunningham*, 108 N.C. App. at 196, 423 S.E.2d at 809, the trial court erred by dismissing the charges that had been lodged against Defendant pursuant to N.C. Gen. Stat. § 15A-910 based upon the State's alleged failure to disclose adequate information concerning blood testing performed in the SBI laboratory.

### 3. Failure to Report Results of Polygraph Testing

The trial court also concluded that the State violated N.C. Gen. Stat. § 15A-903(e) by failing to "fully and completely report the results of the polygraph testing performed by Agent Wilson on [Ms. Ward]" and that the resulting prejudice required dismissal of Defendant's case pursuant to N.C. Gen. Stat. § 15A-910. The trial court erred by making this determination as well.

In *State v. Brewington*, 352 N.C. 489, 506, 532 S.E.2d 496, 506 (2000), *cert. denied*, 531 U.S. 1165, 121 S. Ct. 1126, 148 L. Ed. 2d 992 (2001), the Supreme Court explicitly rejected the defendant's claim that polygraph test results "f[e]ll within the category of 'physical or mental examinations' contemplated under [N.C. Gen. Stat.] § 15A–903(e)." *See also Dunn*, 154 N.C. App. at 6-7, 571 S.E.2d at 654 (recognizing that *Brewington* stands for the proposition that polygraph results are not discoverable pursuant to N.C. Gen. Stat. § 15A-903(e)). Assuming, without in any way deciding, that the record contained sufficient evidence to support the trial court's determination that the State willfully and intentionally failed to disclose to Defendant the results of Ms. Ward's polygraph examination and the underlying data developed during that examination, any such deter-

mination would not support dismissal of the charges against Defendant given that such information is not discoverable. As a result, the trial court erred by concluding that the charges against Defendant should be dismissed as a result of the State's failure to provide Defendant with the results of Ms. Ward's polygraph examination.[12]

## III. Conclusion

Thus, for the reasons set forth above, we conclude that the trial court erred by dismissing with prejudice the charges that had been lodged against Defendant. We do not, however, wish to be understood as commending the practices employed with respect to the testing of the blood allegedly found upon Ava's underwear and sleepers. On the contrary, we share the trial court's displeasure with the manner in which the blood testing results were disclosed to Defendant and the manner in which aspects of the prosecution of this case have been handled. Even so, given our inability to discern any legal basis for the sanction imposed in the trial court's order, we are obligated to reverse it. As a result, the trial court's order should be, and hereby is, reversed and this case should be, and hereby is, remanded to the Durham County Superior Court for further proceedings not inconsistent with this opinion.[13]

REVERSED AND REMANDED.

JUDGES CALABRIA AND THIGPEN concur.

---

12. Although the trial court also determined that the State's failure to disclose certain information violated its orders of 8 October, 12 November, and 23 November 2010, the trial court does not appear to have concluded that the State's inaction with respect to these items violated N.C. Gen. Stat. § 15A-903(e) or required the imposition of sanctions pursuant to N.C. Gen. Stat. § 15A-910. As a result, we need not address the extent, if any, to which the trial court erred by making these determinations.

13. Although Defendant repeatedly notes in his brief that various items of physical evidence have been destroyed, that fact goes to the issue of prejudice rather than whether actual constitutional or statutory violations occurred.