**STATE v. DORMAN**

[225 N.C. App. 599 (2013)]

STATE OF NORTH CAROLINA, Plaintiff
v.
MICHAEL DORMAN, II, Defendant

No. COA12-97

Filed 19 February 2013

**1. Appeal and Error—State's appeal of dismissal in criminal action—jeopardy not attached**

The Court of Appeals had jurisdiction over the State's appeal from the dismissal of a first-degree murder prosecution where the dismissal occurred before trial, so that jeopardy had not attached.

**2. Constitutional Law—due process—destruction of evidence—potential rather than actual prejudice—bad faith required**

In an appeal by the State from the dismissal of a first-degree murder prosecution where the bones on which identification of the victim was based had been returned to the family and cremated, defendant could not meet his burden of demonstrating that the evidence was actually, as opposed to potentially, material and favorable to the defense. Defendant could only demonstrate a violation of due process under *Brady v. Maryland*, 373 U.S. 83, by the presence of bad faith by the State.

**3. Constitutional Law—criminal discovery—destruction of evidence—bad faith—pretrial determination—premature**

In an appeal by the State from the dismissal of a first-degree murder prosecution, the Court of Appeals held that the trial court was premature in concluding before trial that a bad faith constitutional violation (not preserving the bones used to identify the victim) caused such irreparable harm to defendant's case that dismissal was the only appropriate remedy. Defendant had not yet engaged an expert, had not attempted to test the bones that were preserved, and had not attempted to replicate the identification of the victim using radiographs of her teeth.

**4. Constitutional Law—criminal discovery—pretrial determination of violation**

The trial court erred by concluding that defendant's rights were flagrantly violated under *Brady v. Maryland*, 373 U.S. 83, by the State's failure to produce certain information before a pretrial hearing. Defendant came into possession of the information with ample opportunity to make effective use of it.

**5. Criminal Law—discovery—withheld information—pretrial**

The trial court erred in its reliance on *Napue v. Illinois*, 360 U.S. 264, in dismissing a first-degree murder prosecution before trial for a discovery violation. *Napue* involved a conviction obtained by the knowing use of false evidence, while there had been no trial and no conviction in this case.

**6. Constitutional Law—Eighth Amendment—discovery violation—pretrial detention**

The trial court's conclusion that there was an Eighth Amendment violation in a first-degree murder prosecution from the State's failure to disclose information was not supported by a precise legal or factual basis in its order dismissing the case.

**7. Criminal Law—discovery—dismissal as sanction—basis not specified**

The trial court abused its discretion by dismissing a first-degree murder prosecution with prejudice as a discovery sanction where the basis for determining that dismissal was appropriate could not be determined. The dismissal occurred before defendant pled guilty or proceeded to trial; moreover, defendant was given possession of the information before trial.

**8. Criminal Law—discovery—no duty to create document—defendant in possession of information before trial**

Discovery sanctions short of dismissal in a first-degree murder prosecution were vacated because the State had no duty to create or continue to develop documentation regarding an investigation, and because defendant was in possession of the relevant information well before trial.

Appeal by the State from order entered 14 November 2011 by Judge Orlando F. Hudson, Jr., in Durham County Superior Court. Heard in the Court of Appeals 27 September 2012.

*Attorney General Roy Cooper, by Special Deputy Attorney General Robert C. Montgomery, for the State.*

*Glover & Petersen, P.A., by Ann B. Petersen and James R. Glover, for defendant-appellee.*

*National Crime Victim Law Institute and National Association of Crime Victim Compensation Boards, by John G. Barnwell, Margaret Garvin, and Alison Wilkinson, Amicus Curiae.*

HUNTER, JR., Robert N., Judge.

The State appeals from an order entered 14 November 2011 granting Michael Dorman II's ("Defendant") Motion to Dismiss the charge of first-degree murder that had been lodged against him. The trial court also ordered the suppression of certain evidence at "any and all future proceedings in the matter" as an additional sanction for the State's violation of discovery provisions. On appeal, the State argues the trial court erred in: (1) making certain findings of fact which were unsupported by the evidence presented; (2) concluding on the basis of those findings that the State flagrantly violated Defendant's constitutional rights and statutory right to discovery; and (3) concluding dismissal with prejudice was the "only appropriate remedy" for these constitutional and statutory violations. After consideration of the State's arguments and review of the record and applicable law, we reverse the portion of the trial court's order granting Defendant's Motion to Dismiss. We also vacate the trial court's order imposing discovery sanctions against the State. These decisions are to be revisited by the trial judge after receipt of additional evidence as discussed herein.

## I. Factual and Procedural Background

### A. Defendant's Arrest

In March 2008, Lakeia Boxley's ("Ms. Boxley") mother reported to the Durham Police Department that her daughter was missing. Latifah White, Ms. Boxley's sister and a resident of South Carolina, filed a second missing persons report in January 2010 with the Durham Police Department.

In July 2010, more than two years after the first missing persons report, one of Defendant's friends called the Orange County Sheriff's Department. The friend, identified as "Mr. Bryant" in the record, called and reported that Defendant claimed to be in possession of some human bones. On 14 July 2010, Orange County Sheriff's Investigator Tony White was asked to follow up on this tip, and interviewed Mr. Bryant. Mr. Bryant told Investigator White that Defendant confided in him that approximately two years earlier he had met a young woman in Durham who helped him obtain crack cocaine on a

few occasions. Defendant allegedly told Mr. Bryant that he asked this woman to have sex with him, and when she refused, he put a sawed-off shotgun to the woman's head, where it accidently went off. According to Mr. Bryant, Defendant admitted to having kept her bones hidden in his father's house ever since.

Later that same day, Investigator White had Mr. Bryant arrange a meeting with Defendant at Defendant's home. There, Investigator White witnessed Defendant hand over a book bag to Mr. Bryant. After the bag was seized, it was opened at the Sheriff's Office. Inside the bag were bones Investigator White believed to be "the top of [a] skull . . . [an] eye portion . . . a couple rib bones, a femur, and . . . miscellaneous other broken-up bones." Photographs were taken and sent to an archeologist, Dr. Oliver, who opined that the bones were human remains. The bones themselves were sent to the Office of the Chief Medical Examiner ("OCME"), who received the bones either that same day or the next, 15 July 2010. Defendant was arrested on a charge of concealing and failing to report a death. Durham County Public Defender Lawrence Campbell was assigned as Defendant's counsel on 16 July 2010.

### B. Autopsy and Medical Evaluation

While the OCME was in possession of the bones, the Durham Police Department provided the OCME with a synopsis of the investigation up to that point, including their suspicion that the victim was Ms. Boxley. Upon receipt of the bones, Chief Medical Examiner Deborah Radisch assigned the case to Dr. Jonathan Privette, who performed an autopsy on 15 July 2010. Photographs of the bones, which did not amount to a complete skeleton, were taken. In addition, a CT scan of Ms. Boxley's head and teeth was compared to the lower jaw bone, and radiographs were made of that jaw bone. X-rays of the spinal column were also compared to Ms. Boxley's chest x-rays. Dr. Privette identified the bones as those of Ms. Boxley based upon a comparison of the ante- and post-mortem radiographs of the jaw bone and the jaw bone itself.

In addition, Dr. Privette's autopsy report noted that a small portion of the skull "exhibit[ed] multiple discrete, small, gray, generally round discolorations . . . consistent with impact and wipe-off from small metal projectiles or extended surface contact with small metallic objects." In his autopsy report, Dr. Privette indicated that "[b]ased on the history and investigative findings, it is my opinion that the cause of death in this case is undetermined homicidal violence, with

findings suggestive of blunt head trauma consistent with a shotgun wound." Although the autopsy report was dated 15 July 2010, the OCME did not document in its internal records that Dr. Privette had identified the remains as those of Ms. Boxley until 29 July 2010. On 21 September 2010, the OCME released most of the bones in its possession, including the jaw bone used in making the identification, to a mortuary in Durham. However, the OCME did not release all of the bones, retaining the small portion of the skull that possessed the round discolorations. The bones that were released were cremated on either 22 or 23 September 2010, and Ms. White received her sister's ashes on 24 September 2010.

From the time of his arrest until 14 September 2010, Defendant remained incarcerated on the concealing a death charge. On 5 August 2010, the State moved for and received an order committing Defendant to Dorothea Dix Hospital for an evaluation of his capacity to proceed. In its motion, the State requested Defendant undergo an evaluation in light of concerns about his mental health. The State explained that:

> Defendant indicated that he found some human bones one day. The next day he got some rubber gloves[,] went back to get the bones[,] and then brought them home. He used the bones for sexual gratification.

> When question [sic] by law enforcement officers he indicated that he preferred to be called by another name. He stated that he did tell his friend that he had killed a woman but that was just a fantasy to kill someone.

> Based upon the conversation the defendant had with a friend about murder, his admission to law enforcement that he does fantasize about murder, his admission of using bones for sexual gratification, and his mannerism[s] when questioned by law enforcement, the State questions this defendant's capacity to proceed at this time and request[s] an evaluation be ordered.

Defendant was received at Dorothea Dix on 14 September 2010. An evaluation of Defendant revealed that he had been suffering from hallucinations while incarcerated, including visions of "spots mov[ing] on the floor of his cell." Defendant also reported feeling as though "someone [was] looking at [him,] through [him] to [his] cell, and [that] it was pure evil." Defendant also believes he is a woman trapped in a man's body, desires gender re-assignment surgery, and

STATE v. DORMAN

[225 N.C. App. 599 (2013)]

prefers to be called "Sarah Ann." He described becoming sexually aroused by violent novels and movies, and claimed to spend a couple of hours every night viewing these materials. Doctors at Dorothea Dix diagnosed Defendant with Mood Disorder, Sexual Disorder, Gender Identity Disorder, Personality Disorder, and Borderline Intellectual Functioning, but were of the opinion that Defendant was "capable of proceeding to trial." Defendant was discharged from Dorothea Dix on 21 October 2010, after completion of the evaluation, and was returned to the custody of the Durham County Jail.

### C. Indictment and Discovery

While he was undergoing evaluation at Dorothea Dix, the Durham County grand jury indicted Defendant for one count of first degree murder on 7 September 2010. On 15 October 2010, the Durham County District Attorney's Office voluntarily dismissed the concealment of a death charge that had been pending against Defendant.

On 16 September 2010 Mr. Campbell filed a Motion to Preserve Evidence and a Request for Voluntary Discovery. A Motion for Discovery was filed on 17 September 2010. The Motion to Preserve Evidence requested the entry of an order directing the State "to preserve and retain intact and not to destroy or alter any evidence, tangible . . . object, or other information relating in any manner to this case." The Motion to Preserve did not specifically mention human remains.

On 7 October 2010, during the morning session of Durham County Superior Court, Mr. Campbell was informed by Judge Kenneth Titus that District Attorney Tracey Cline had unilaterally moved Defendant's case from that day's court date to the next case management session, which was to be held on 4 November 2010. Mr. Campbell noted that he had not yet received any discovery in the case, and requested to be heard on the Motion to Preserve Evidence he had filed. The following exchange took place in open court later that afternoon between Mr. Campbell, District Attorney Cline, and Judge Titus:

> MR. CAMPBELL: Judge, this is a case involving some human remains. Originally the charge was failure to report a death, the allegation against my client—who is in Raleigh at Dorothea Dix at this time . . . was that he was concealing some human remains and had been for some period of time. Since [then], Ms. Cline obtained an indictment charging him with murder. There have been . . . averments or allegations made from the state that

**STATE v. DORMAN**

[225 N.C. App. 599 (2013)]

they have been able to, through some scientific methods, to not only ascertain the identity of those human remains, but that they've also been able to . . . determine how that person died. And so we would consider that to be the subject matter of this entire lawsuit and would argue that that is very critical evidence.

If you'll note in the file, Judge, there should be a motion that was filed on . . . September the 16th of this year, a motion to preserve evidence and within that, of course, we did not list human remains but we asked that all the evidence be preserved. My purpose for being heard today was . . . to be sure that the evidence, that is the human remains that are the subject matter of this lawsuit, would be preserved so that they would be available for independent testing by the defendant. Ms. Cline then informed me this morning that the remains are no longer in law enforcement custody, that they have been, in fact, returned to a family and that those remains have been buried. I would argue that there's no way this case can proceed without us being able to have access to that evidence.

MS. CLINE: Judge, I learned . . . this morning that Mr. Campbell wanted the state to preserve what was left of the body of the victim in this matter. And when I learned of that, I indicated to Mr. Campbell that I knew that the bones had been returned to the family but I would call the medical examiner and the investigation agency [and see] what had been preserved as it relates to this order, since I too was concerned about the cause of death. So the medical examiner, it preserved the portion of her skull that appeared to [be] consistent with being shot with a gunshot wound. However, the other bone fragments were . . . returned to the family and buried but they did preserve the portion of the skull that the state contends is consistent with being shot . . . with a shotgun.

. . . .

If the defense thinks it's necessary to exhume the other portions of the body . . . they have been buried by the family.

I have not called the family myself to verify that since I learned of this this morning but I can do that and at the next court hearing I will have that information, but I do know that they have preserved the portion of the skull that testing was done on to determine whether or not she was shot with a shotgun. That's what I can tell the Court and Mr. Campbell at this time.

MR. CAMPBELL: Judge, again, I don't think that satisfies our obligations to my client. I am not—I'm certainly not a pathologist or forensic expert of any kind, but we're going to have to have someone identify this person. This is some remains that I am told were possibly as long as two years old. And they need to be identified and we need to be able to run whatever other tests, I have no discovery so far, so I don't know what tests have been performed, I don't know what tests I'm going to have to refute, but it's my position that we would be entitled to the evidence.

THE COURT: Well, we'll hold off on the exhumation of the body because if you want to know who it is, the skull is an adequate portion of the body to make that determination, and if the state is contending that the cause of death of that person was from the—a shot to the skull and that was preserved, that may be enough.

. . . .

But if what they have is not sufficient to let your expert to determine, or to examine their report and determine from the evidence that's preserved the cause of death or to dispute that or the identity of the person, then I would consider granting your motion to exhume the body, if that becomes an issue. At least at this point, I'll hold off on that until additional discovery.

MR. CAMPBELL: Thank you, Judge.

Approximately one month later, on 4 November 2010, Judge Titus during open court orally ordered "whatever discovery the State currently has be turned over to Mr. Campbell." Judge Titus entered a written order on 7 December 2010 requiring the Durham County District Attorney's Office to "preserve and protect all evidence collected by any and all agencies that may be relevant to the trial of

STATE v. DORMAN

[225 N.C. App. 599 (2013)]

these matters." The order specifically encompassed "the human bones examined by the Office of the Medical Examiner for North Carolina to determine the cause and manner of death," but made no specific mention of the bones used by the OCME to identify the victim. At the time of the order's entry, Defendant had still not received a copy of the autopsy report from the State.

On 30 November 2010, the State filed a discovery response indicating it was disclosing to Defendant, among other things, "[a] copy of the State's entire file regarding [the] case," and that it was "not aware of any additional material or information which may be exculpatory in nature with respect to the Defendant." The discovery response indicated that "[s]hould [the State] learn of the existence of any such [potentially exculpatory] material or information in the exercise of due diligence, we will notify the Defendant." Defendant did not receive a copy of the autopsy report until 5 January 2011. The following day, 6 January 2011, District Attorney Cline forwarded a copy of Judge Titus' 7 December 2010 order requiring the preservation of evidence to the OCME for the first time.

At a competency hearing on 6 May 2011, Senior Resident Superior Court Judge Orlando F. Hudson, Jr. found Defendant competent to proceed in light of the parties' stipulation to the information contained in the report prepared by the staff at Dorothea Dix. At this same hearing, Mr. Campbell requested to be heard with respect to the issue of Defendant's bond at the next available case management session. Mr. Campbell also inquired about the remains he believed were still in possession of the OCME:

> [MR. CAMPBELL]: This case involves some evidence that was preserved, as I understand it, by the medical examiner's office, those being some human bones. And it's my understanding that there was a determination made about the identity of this person, as well as the manner and cause of death of that person. We're going to want to hire someone, a forensic pathologist, to do an independent testing of those items so that we can see if he or she concurs with what the medical examiner has said. I've asked [Assistant District Attorney Roger] Echols to contact the medical examiner's office to try to arrange whatever protocol they may have as to how we go about that[.] I've certainly never had to do this type of testing before, and I'm asking Mr. Echols to arrange that.

**STATE v. DORMAN**

[225 N.C. App. 599 (2013)]

THE COURT: Yes.

MR. ECHOLS: Yes, Your Honor. Mr. Campbell is correct . . . as far as what the evidence is in the case. And I have been in contact with the medical examiner's office. I expected to receive a call back as early as today, but I had not as of yet, as far as regarding the procedures for a defense expert to examine the evidence in order to be able to make their findings. What I did get from the medical examiner's office is this type of thing has been done before, and they will accommodate the Court's order. However, I do not know exactly the procedure yet, and I will hopefully have that today, but I certainly should have it well before general CMS.

Subsequently, at the scheduled 7 June 2011 bond reduction hearing before Judge Hudson, Mr. Campbell expressed concern about the state of the remains and its potential impact on Defendant's case. Mr. Campbell explained that:

[t]he bones were taken to the medical examiner's office and allegedly a positive identification was made at the medical examiner's office.

Sometime in September of last year [(2010)] the District Attorney informed me that the bones had been returned to the family for burial. At that time I indicated to the District Attorney that we had a motion to preserve the evidence. And that, in fact those bones—that being the evidence—had been destroyed that we would be moving for a motion to dismiss.

The District Attorney represented to the court at that time that the bones or the skeletal remains that had been used by the medical examiner to identify who this person was had in fact been preserved and maintained at the medical examiner's office.

. . . .

When I started reviewing the autopsy report it indicated in that report that the identification of the body had been made not through any examination of the bones but through a dental examination.

. . . .

We are now under the belief that the evidence that would be needed by the defendant for an independent examination so that we can, through our own expert, identify who this person was [and] the cause and the manner of death had been destroyed. That those . . . teeth no longer exist. That they are not at the medical examiner's office.

We would argue that that is highly prejudicial to Mr. Dorman's case; that we have been deprived of the opportunity to have an independent examination. And that for those reasons, if that evidence is not present, that this case against Mr. Dorman should be dismissed.

Mr. Echols said he would confer with the OCME to determine exactly what remains were still in its possession. Judge Hudson retained jurisdiction over the matter, and scheduled a follow-up hearing for 9 June 2011. At that hearing, Mr. Echols reported that the OCME had in fact released most of the bones to Ms. White, withholding only a 7-10 centimeter long piece of the skull bearing the small, gray, round discolorations. Mr. Campbell argued that since the jaw bone and teeth used by the OCME to make an identification had been destroyed, Defendant was irreparably prejudiced in his ability to prepare an adequate defense, and requested that the charge against Defendant be dismissed. Judge Hudson suggested Mr. Campbell file a formal motion to that effect, and requested the parties agree on a date for a hearing on the motion.

## D. Hearing on Motion to Dismiss

Defendant's "Motion to Dismiss Because of Destruction of Evidence" came before Judge Hudson on 28 June 2011. At the hearing, Defendant called Dr. Privette as his only witness. Dr. Privette testified that in making the identification of the bones as Ms. Boxley he relied on a comparison of a radiograph of the jaw bone containing the victim's teeth, the jaw bone itself, and ante-mortem radiographs he received from the Durham Police Department.[1] Dr. Privette acknowledged that the jaw bone used to make the identification had subsequently been released to Ms. White and been cremated. When asked why the OCME retained the bones for nearly two months after the

---

1. The autopsy report prepared by Dr. Privette states that the body was identified "based on comparisons between ante-mortem radiographs of the head and examination of the remains."

autopsy was performed, Dr. Privette indicated that the OCME released them when the "family requested the remains."

Although Dr. Privette asserted that the jaw bone was "not necessary to make a positive identification," he acknowledged that in the week prior to his testimony, the OCME and he had solicited a second opinion regarding identification from Dr. Allen Samuelson of the UNC School of Dentistry. In an email to Dr. Privette, Dr. Samuelson stated that he was "indeed . . . having a difficult time of [identifying the victim,]" by comparing the ante- and post-mortem radiographs of the jaw bone the OCME had provided. Specifically, he asked Dr. Privette if he could send (1) a photograph of the jaw bone taken from a particular vantage point and (2) additional radiographs of the jaw bone. Despite the unavailability of this evidence in light of the jaw bone's cremation, Dr. Samuelson ultimately concluded upon review of the x-rays and photographs that were provided to him that the "many areas of congruity and no manifest exclusionary information . . . supports the evidence" that the bones were in fact Ms. Boxley's. Dr. Privette claimed he had not sought a second opinion earlier because he "didn't think [he] was going to need it until [the defense] started questioning the identification."

Dr. Privette admitted that he believed he was dealing with a homicide from the beginning of his involvement, "due to the circumstances of the case" as conveyed to him by the Durham Police Department. He testified that he had no personal contact with the District Attorney's Office about Defendant's case prior to 21 September 2010, and was not aware of anyone else from the OCME having had contact with the District Attorney's Office during that time.

Dr. Privette also indicated that he did not consider the bones in this case to be "evidence," and that, in the three-plus years he had worked as a medical examiner, he had never "submitted a body as evidence." He further explained that the OCME does not have written procedures dealing with the release of human remains, because it does "essentially the same thing every time." Dr. Privette testified that "[o]nce we [(OCME)] are done with our investigation of the body and there has been a positive identification, and once a family comes forward to claim the remains, we release the body." Dr. Privette acknowledged that the OCME retained a small portion of the skull containing the small discolorations, consistent with the State's theory of the cause of death, in the event someone wanted to review that

portion of the bones at a later date. He explained that the OCME did not keep the other bones because "we [(OCME)] didn't feel like there was any part of the other bones that had any evidentiary value or any value as [to] determining the manner and cause of death."

Although a portion of the skull was retained by the OCME, this fact was not noted in the autopsy report. In Dr. Privette's opinion, this made the autopsy report "incomplete" as opposed to "inaccurate." He conceded that his conclusion that "the cause of death in this case is undetermined homicidal violence, with findings suggestive of blunt head trauma consistent with a shotgun wound" was largely based on the information provided to him by the Durham Police Department. Dr. Privette acknowledged that the OCME was not able to "determine the cause of death," but was able to "[come] to a decision on [the] manner of death" being homicide. Dr. Privette testified that although bones are "not the best material to use for a DNA sample," obtaining a DNA sample from bones was "possible" albeit "[n]ot in all circumstances." No DNA sample had been obtained from the jaw bone at the time of his testimony.

Dr. Privette also acknowledged receiving a subpoena which, among other things, required he produce "[t]he complete medical examiner's file" regarding Ms. Boxley's death including, "[a]ny and all email transmissions to or from the chief medical examiner's office relative to [Ms. Boxley] and/or [Defendant]." At the hearing, Dr. Privette only produced two emails—an inquiry from a staff member in the OCME's record office asking for the availability of a death certificate, and Dr. Privette's response. Dr. Privette did not produce any emails regarding the release of the bones to Ms. White.

The State did not present any testimonial evidence at the 28 June 2011 hearing, but did introduce a number of photographs, a copy of Dr. Samuelson's comparison report, and Dr. Privette's autopsy report. At the conclusion of the hearing, Judge Hudson took Defendant's Motion to Dismiss under advisement.

### E. Discovery by Judge Hudson of VCS Involvement

After the hearing on Defendant's Motion to Dismiss, Judge Hudson determined upon review of the record that North Carolina Victim Compensation Services ("VCS") had paid for the cremation of the bones released by the OCME. On 7 July 2011, Judge Hudson issued an order requiring VCS to turn over its entire file with regard to Ms. White's VCS application. In an order dated 13 July 2011 Judge

**STATE v. DORMAN**

[225 N.C. App. 599 (2013)]

Hudson placed a redacted version of those files into the record. This order contained a finding that the VCS file "[had] been in the possession of the State of North Carolina since August, 2010 but [had] not previously [been] provided to the Defendant or the Court for review." Judge Hudson further found that "Defendant had a statutory and constitutional right to receive the information" in the VCS file "in a timely manner."

Following entry of this order, the State filed a motion on 14 July 2011 seeking to reopen the presentation of evidence on the Motion to Dismiss. In this motion, the State claimed that "it had no opportunity to examine the files of [VCS]" at any point, and asserted that VCS was not a "prosecutorial agency" such that the State had any obligation to turn over its files during discovery. Judge Hudson granted the State's motion to reopen the presentation of evidence in part, and scheduled hearings for the week of 15 August 2011 "to address the issues of whether or not the State and its agents assisted in the destruction of the bones and teeth[.]"

### F. Hearing on the State's Role in Destruction of the Bones

At a hearing held over the course of two days, the trial court heard testimony from a number of witnesses regarding their involvement in Defendant's case.

#### 1. Detective Robinson's Testimony

After first calling Investigator White and another investigator from the Orange County Sheriff's Department, the State called Detective Christopher Robinson of the Durham Police Department. Detective Robinson testified that he was assigned to investigate Defendant's case in July 2010, after receiving information from Orange County law enforcement regarding the discovery of a person in possession of human bones. Believing these bones might be those of Ms. Boxley, Detective Robinson asked the OCME what information would be helpful in making an identification.[2] He testified that he then obtained a court order allowing him to retrieve from Duke Hospital a CD containing a CT scan of Ms. Boxley's head and teeth, and delivered that CD to the OCME. Detective Robinson also provided the OCME with a synopsis of his investigation up to that point,

---

2. Detective Robinson did not testify as to why he suspected Ms. Boxley was the victim in this case. However, the record reveals that a legal assistant in the Durham Police Department remembered the circumstances of Ms. Boxley's disappearance two years earlier, and that this may have been the basis for the Durham Police Department's initial belief regarding the victim's identity.

including his suspicion that the victim was Ms. Boxley, "so that [the OCME could] have an understanding of what [the Durham Police Department thought] the cause of death might have been."

Detective Robinson then testified that sometime in mid-July 2010, Dr. Clyde Gibbs, an employee of the OCME, informed him that Dr. Privette had identified the bones as Ms. Boxley's. Detective Robinson then contacted Ms. White, Ms. Boxley's next of kin, and informed her of her sister's death. He also notified the OCME that he had contacted Ms. White, and "gave [the OCME her] information." Detective Robinson testified that he denied encouraging Ms. White to cremate the bones or knowing that Ms. White intended to cremate the bones. He claimed that he was not aware of the order to preserve evidence entered by Judge Titus until "way after" the bones had been released by the OCME.

Detective Robinson indicated that he contacted Lukas Strout, a victim's advocate in the Durham Police Department's Victim Services Unit, and asked him if he would call Ms. White, as she had inquired about possible services that might have been available. Detective Robinson stated that this was the only contact he had with Mr. Strout during the investigation.

### 2. *Mr. Strout's Testimony and the OCME's Release of the Remains*

The State next called Mr. Strout. He testified that he had been employed in the Durham Police Department's Victims Services Unit as a victim's advocate for about seven years, and that as part of his job, he acts as a "[l]iaison between families, investigators, the court personnel, [and] victim compensation [services]." He testified that he has no investigational responsibilities or law enforcement authority.

Mr. Strout stated that Ms. White contacted him shortly after Detective Robinson had mentioned her. On 26 August 2010 Mr. Strout sent Ms. White materials regarding services available to the families of crime victims in North Carolina. These materials included information about how to apply for financial compensation from VCS. He explained that a VCS application is "an application that is offered by [VCS] as a means of financially compensating victims of violent crimes, and [that] they pay [certain expenses] as a last resort." Mr. Strout testified that he assisted Ms. White in preparing her application for compensation, which was eventually approved on 5 January 2011.

Mr. Strout also explained that Ms. White had twice contacted him concerning when the remains of her sister would be released from the OCME. On 8 August 2010, Mr. Strout e-mailed Dr. Gibbs in the OCME requesting "information about what needed to be done for the family to receive [the] remains." Dr. Gibbs responded to Mr. Strout's 8 August 2010 email regarding release of Ms. Boxley's bones on 10 September 2010, by saying he had contacted Detective Robinson, "wondering if there was any reason to hold on to the remains any longer." Mr. Strout responded that same day, thanking Dr. Gibbs for his help, and indicating he would notify the family once the OCME heard from Detective Robinson.

On 19 September 2010, Dr. Gibbs emailed Mr. Strout the following:

> Per Det. Robinson, we are free to let Ms. Boxley be released. The family just needs to make arrangements w/funeral home/crematory in SC and have that service either call us or have them select a transporter to p/her up . . . . Thank you again so very much.[3]

Two days later, the OCME released the bones to a mortuary in Durham, which cremated them. The bones that were released were cremated on either 22 or 23 September 2010, and Ms. White received her sister's ashes on 24 September 2010.

Mr. Strout testified that he never recommended cremation to Ms. White, and that "to the best of his knowledge" no one in the Durham Police Department or District Attorney's Office had ever advised him to recommend cremation. He denied having ever consulted with police investigators or the District Attorney's Office about what should be done with the remains. He did implicitly acknowledge that he was aware Ms. White was considering cremation as an option. However, he did not disclose the nature of his conversations with Ms. White to the District Attorney's Office because they were "confidential client interaction[s]."

### 3.  Testimony of VCS Staff

The State next called three employees of VCS: administrative assistant Melanie Palzatto, claims investigator Liddie Shopshire, and VCS director Janice Carmichael. All three testified about the process

---

3. None of these emails between Robinson, Gibbs, and Strout were produced by Dr. Privette at the 28 June 2011 hearing on Defendant's Motion to Dismiss.

VCS utilized in evaluating Ms. White's application for compensation. Ms. Palzatto testified that VCS received what it considered to be Ms. White's original application on 27 September 2010.[4] Ms. Palzatto forwarded the application to Ms. Shopshire who investigated the claim. As part of her investigation, Ms. Shopshire contacted Detective Robinson on or about 22 October 2010 requesting information about the case. Detective Robinson gave her a brief description of the Durham Police Department's theory of the case. This information, along with Ms. White's completed application, "was enough for [Ms. Shopshire] to make a recommendation" to Ms. Carmichael that she approve the application.

Upon the recommendation of Ms. Shopshire, Ms. Carmichael gave final approval to Ms. White's application on 5 January 2011. Ms. Carmichael testified that although VCS conducts an independent investigation into whether to approve an application using information provided by police, VCS's files are considered confidential, and are not shared with the prosecutor's office absent a court order. Ms. Carmichael testified that VCS does not consult with the prosecution in determining whether to approve an application. She stated her office did not have any contact with the Durham District Attorney's Office, the Durham Police Department, or Ms. White concerning whether the bones in this case should be cremated. Ms. Carmichael explained that in the eleven years she had been the director of VCS, she had never conferred with any prosecutor's office or law enforcement agency before making a recommendation to give an award, and that in her opinion VCS is not a "prosecutorial agency."

### 4. Ms. Archibald's Testimony

The following day, the court heard testimony from Martha Ann Archibald, director of the J. Henry Stuhr funeral home in Charleston, South Carolina. Ms. Archibald testified that in August 2010, Ms. White met with her regarding funeral arrangements for her sister. Ms. White explained to Ms. Archibald that there had been a death in her family and that she did not have the financial means to afford funeral arrangements. However, Ms. White indicated that she was applying for assistance from VCS. Being familiar with a similar program in South Carolina, Ms. Archibald agreed to provide funeral services for Ms. White and her family. Ms. Archibald testified that Ms. White

---

4. Ms. White had previously filed an application, but it had been rejected for technical non-compliance with the application's instructions. In response to this first application, VCS requested Ms. White submit another application.

requested her sister's remains be cremated, and that the remains be delivered to her in South Carolina. Ms. Archibald ultimately arranged to have a mortuary in Durham pick up the remains from the OCME, cremate them, and transport them to South Carolina.

### 5. Ms. White's Testimony

Following Ms. Archibald's testimony, the State called Ms. White. She testified that Detective Robinson had first notified her of her sister's death in July 2010. She estimated that she had more than thirty conversations with Mr. Strout between July 2010 and September 2010. In addition to her communications with Mr. Strout, Ms. White also had numerous conversations with Zandra Ford, District Attorney Cline's administrative assistant, and Detective Robinson's supervisor, Sergeant Perkins. She estimated having had nearly 50 conversations with Sergeant Perkins alone in July and August 2010. However, Ms. White testified that none of her conversations with Ms. Ford or Sergeant Perkins concerned a time table for the release of her sister's remains; instead, she only spoke with Mr. Strout in "the second week of July" about the possibility of getting her sister's remains released. Mr. Strout's response to Ms. White's questions in this regard was that he would "look into it and see if the coroner [was] ready to release [the] body." Ms. White testified that she was under the impression the OCME was ultimately the entity responsible for deciding when her sister's remains would be released, although she never called or communicated with the OCME directly. As of the date of her testimony, Ms. White remained unsure of who ultimately made the decision to release the bones.

Ms. White stated that it was her desire to have her sister cremated and that no one from the Durham Police Department or District Attorney's Office suggested she cremate her sister's bones. Ms. White testified that no one from the OCME or the District Attorney's Office informed her that she had not received all of the bones recovered from Defendant, and that she only discovered this fact after reading media accounts of the case.

### 6. Dr. Radisch's Testimony

The hearing concluded with testimony from Dr. Deborah Radisch, the Chief Medical Examiner for the State of North Carolina, and head of the OCME. Dr. Radisch testified that she assigned this case to Dr. Privette in July 2010, and supervised his work in the matter. She explained that her office "follow[s] a procedure according to the

statutes that basically states that when we are done with our inspection and investigation of the remains, then we release the remains to the next of kin." Dr. Radisch claimed that her office followed this procedure in this case, and that the OCME was not notified that it needed to retain the bones until over four months after they had been released and cremated. She declared that she did not consider the portion of the skull that was retained by her office to be "evidence," and explained the rationale for retaining only this particular bone fragment:

> [W]e retained a small piece of skull which had some markings on it that were suspicious to us, but [we are] certainly not a hundred percent sure that these could represent wipe-off from pellets on the inside of the skull. And . . . there might be [DNA], and we wouldn't know [whether DNA was available] until we tried or until someone tried [to obtain a sample].

Dr. Radisch admitted she was aware of the subpoena served upon Dr. Privette in June 2010 requiring him to produce all email communications from the OCME involving this case. However, she stated that she did not know why Dr. Privette failed to produce the emails between Dr. Gibbs, Detective Robinson, and Mr. Strout at that time. She speculated that Dr. Privette had probably omitted the emails because he had only "searched his account and gave [the Court] whatever e-mails he had in his account."

Dr. Radisch could not confirm whether her office did anything with the bones between 5 August 2010 and 21 September 2010, and could not provide an explanation for the lack of any information in the OCME's file during this time. She opined that under her interpretation of the statute requiring release of remains to the next of kin upon completion of an "investigation," the word "investigation" meant "the investigation in our [(OCME's)] office," although she observed "that sometimes [that investigation] can go along with the investigation of law enforcement." She denied that Detective Robinson was the individual who made the ultimate decision to release the bones, despite the emails exchanged between Dr. Gibbs and Detective Robinson.

---

At the conclusion of the hearing conducted on 15 and 16 August 2011, Judge Hudson granted Defendant's Motion to Dismiss, finding that "the State and/or its agents have destroyed evidence and that as a result of this destruction his requested relief under North Carolina

General Statutes 15A-903, 910, 954, and the due process clauses of the [5th] and 14th Amendment, and the case of Brady versus Maryland, is allowed." The State served written notice of appeal on 24 August 2011.

On 16 August 2011, Judge Hudson ordered Defendant to undergo an immediate medical and mental health evaluation to determine if he "is a danger to himself or others."[5] On 14 November 2011, Judge Hudson entered a second written order regarding Defendant's Motion to Dismiss. The State served a written notice of appeal from this order on 22 November 2011. The record in this case was settled on 18 January 2012 by stipulation of the parties.

## II. Jurisdiction

[1] The North Carolina General Statutes provide that "[u]nless the rule against double jeopardy prohibits further prosecution, *the State may appeal from the superior court to the appellate* division . . . [w]hen there has been a decision or judgment dismissing criminal charges as to one or more counts." N.C. Gen. Stat § 15A-1445(a)(1) (2011). Under both the federal and North Carolina constitutions, jeopardy does not attach until, among other things, a "jury is impaneled and sworn." *See State v. Gilbert*, 139 N.C. App. 657, 665-66, 535 S.E.2d 94, 99 (2000). Defendant's case has not yet proceeded to trial. Therefore, jeopardy has not yet attached here. Thus, we have jurisdiction over the State's appeal.

## III. Analysis

### A. Standard of Review

In reviewing a trial court's grant of a criminal defendant's motion to dismiss, we are " 'strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law.' " *State v. Williams*, 362 N.C. 628, 632, 669 S.E.2d 290, 294 (2008) (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)). In contrast, this Court reviews a trial court's conclusions of law *de novo. See State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011).

---

5. It is unclear from the record whether Defendant remains under medical and/or psychological supervision.

Distinguishing a finding of fact from a conclusion of law can be an elusive task. "As a general rule, 'any determination requiring the exercise of judgment . . . or the application of legal principles . . . is more properly classified a conclusion of law.' " *In re B.W.*, 190 N.C. App. 328, 335, 665 S.E.2d 462, 467 (2008) (quoting *In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997)) (alterations in original). Ultimately, "[a] trial court's mislabeling a determination, however, is inconsequential as the appellate court may simply re-classify the determination and apply the appropriate standard of review." *State v. Hopper*, 205 N.C. App. 175, 179, 695 S.E.2d 801, 805 (2010) (citation and quotation marks omitted).

## B. *Constitutional Violations*

In its order, the trial court concluded that the State flagrantly violated Defendant's constitutional rights by: (1) failing to "provide [Defendant] in a timely manner with access" to the bones used by the OCME to determine the identity of the victim; (2) "failing to discover and disclose to [Defendant] the role [the State's] agents took in assisting, facilitating, and paying for the permanent destruction of material and favorable evidence in a timely manner;" (3) failing to provide Defendant with access to certain emails exchanged between the OCME and Detective Robinson prior to the 28 June 2011 hearing on Defendant's Motion to Dismiss; (4) failing to "correct misrepresentations of material fact" made by District Attorney Cline, Dr. Privette, and Detective Robinson at various points during the proceedings against Defendant; and (5) failing to disclose information in the State's possession, while Defendant was incarcerated, that the trial court concluded the State "had a statutory and constitutional obligation to disclose." The trial court further concluded that these violations "caused such irreparable prejudice to [Defendant's] case that a dismissal with prejudice is the only appropriate remedy under N.C. Gen. Stat. §15A-954(a)(4)."

N.C. Gen. Stat. § 15A-954(a)(4) (2011) provides that "[t]he court on motion of the defendant must dismiss the charges stated in a criminal pleading if it determines that: . . . [t]he defendant's constitutional rights have been flagrantly violated and there is such irreparable prejudice to the defendant's preparation of his case that there is no remedy but to dismiss the prosecution." "As the movant, [the] defendant bears the burden of showing the flagrant constitutional violation and . . . irreparable prejudice to the preparation of his case." *Williams*, 362 N.C. at 634, 669 S.E.2d at 295. The decision that a defendant has

satisfied the elements of N.C. Gen. Stat. § 15A-954(a)(4), and thus is entitled to a dismissal, is a conclusion of law reviewable *de novo*. *Id*. at 632, 669 S.E.2d at 294. "[S]ince [Section 15A–954(a)(4)] contemplates drastic relief, a motion to dismiss under its terms should be granted sparingly." *State v. Joyner*, 295 N.C. 55, 59, 243 S.E.2d 367, 370 (1978).

As the trial court held that each of the alleged constitutional violations both individually and cumulatively necessitated dismissal with prejudice of the charge against Defendant, we must address each of the State's challenges to the alleged violations.

### 1. Destruction of Human Remains

[2] The State first argues that the trial court erred in finding that the destruction of the purported bones of Ms. Boxley resulted in a flagrant violation of Defendant's constitutional right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. This includes evidence "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). "[T]he duty to disclose such evidence is applicable even though there has been no request by the accused." *Strickler v. Greene*, 527 U.S. 263, 280 (1999).

"To establish a *Brady* violation, a defendant must show (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *State v. McNeil*, 155 N.C. App. 540, 542, 574 S.E.2d 145, 147 (2002), *disc. rev. denied*, 356 N.C. 688, 578 S.E.2d 323 (2003). "Favorable" evidence can be either exculpatory or useful in impeaching the State's evidence. *Williams*, 362 N.C. at 636, 669 S.E.2d at 296. "Evidence is considered 'material' if there is a 'reasonable probability' of a different result had the evidence been disclosed." *State v. Berry*, 356 N.C. 490, 517, 573 S.E.2d 132, 149 (2002) (citing *Kyles*, 514 U.S. at 434). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). However, when the evidence is only "potentially useful" or when " 'no more can be said [of the evidence] than that it could have been subjected to tests, the results of which might have exonerated the defendant,' " the State's failure to preserve the

evidence does not violate the defendant's constitutional rights unless a defendant can show bad faith on the part of the State. *State v. Mlo,* 335 N.C. 353, 373, 440 S.E.2d 98, 108 (1994), *cert. denied,* 512 U.S. 1224 (1994) (quoting *Arizona v. Youngblood,* 488 U.S. 51, 57 (1988)).

The State acknowledges that most of the bones that are the subject of this dispute have been destroyed. Accordingly, it is speculative to evaluate to what degree, if at all, those bones would have been material and favorable to Defendant's case. Thus Defendant cannot meet his burden of demonstrating the evidence was actually, as opposed to potentially, material and favorable to his defense. Accordingly, Defendant may only carry his burden of demonstrating a *Brady* violation in the presence of bad faith on the part of the State. *See id.*

**[3]** In its order, the trial court did in fact make findings that the State acted intentionally and in bad faith with regard to the destruction of the bones. Specifically, the trial court found, *inter alia,* that:

126. [T]he Office of the District Attorney for Durham County, the Durham Police Department, and the Office of the Chief Medical Examiner for the State of North Carolina were aware of the importance of establishing the identity of the decedent . . . in this case from July 14, 2010 through the present. When collectively they allowed, facilitated, and arranged for the permanent destruction of the remains in this case they knew they were destroying information that would deprive [Defendant] of the ability to obtain and investigate information that would be material and favorable to his defense, . . . increasing the likelihood he would waive his rights to trial and enter a plea of guilty . . . .

127. [T]he Office of the Durham County District Attorney and its agents to include the Office of the Chief Medical Examiner and the Durham Police Department intentionally failed to document appropriately, preserve information and disclose information that they knew had to be disclosed to [Defendant] as required by statutes, case law, court orders and the Constitution of the United States of America.

129. [T]he motivation for the failure to disclose to the defense that the remains had been destroyed until June 9, 2011 and the role the state's agents assumed in facili-

tating and paying for the permanent destruction of the remains was an intentional suppression of *Brady* information by the Durham District Attorney's Office and was intended to deprive the defendant of knowledge that would have enabled his attorney to prepare a successful cross examination of multiple witness[es] they knew to be critical to the state's case. . . .

In sum, the trial court found bad faith not only on the part of the District Attorney's Office, but also on the part of the Durham Police Department, VCS, and the OCME.

However, we need not address the issue of bad faith or the relationship, if any, between the District Attorney and the other agencies. Evidence of bad faith standing alone, even if supported by competent evidence, is not sufficient to support a dismissal under N.C. Gen. Stat. § 15A-954(a)(4).

A dismissal pursuant to Section 15A–954(a)(4) is not appropriate in every case in which there has been a flagrant constitutional violation. The violation must have also caused "such irreparable prejudice to the defendant's preparation of his case that there is no remedy but to dismiss the prosecution." *Williams*, 362 N.C. at 639, 669 S.E.2d at 298 (quotation marks and citation omitted). "[D]efendant bears the burden of showing . . . irreparable prejudice to the preparation of his case." *Id.* at 634, 669 S.E.2d at 295. Assuming, but in no way deciding, that Defendant's constitutional rights were flagrantly violated, we must consider the trial court's conclusion that any violation "caused such irreparable prejudice to [Defendant's] case that a dismissal with prejudice is the only appropriate remedy under N.C. Gen. Stat. § 15A-954(a)(4)." This analysis is conceptually separate from the issue of whether a defendant has met his burden under *Brady* of showing that evidence was "material" or "favorable" such that a finding of bad faith is unnecessary.

As noted, "[Section 15A–954(a)(4)] contemplates drastic relief, [and] a motion to dismiss under its terms should be granted sparingly." *Joyner*, 295 N.C. at 59, 243 S.E.2d at 370. "The decision that a defendant has met the statutory requirements of [Section] 15A–954(a)(4) and is entitled to a dismissal of the charge against him is a conclusion of law subject to *de novo* review." *State v. Allen*, ___ N.C. App. ___, ___, 731 S.E.2d 510, 520 (2012) (quotation marks and citation omitted). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the

lower tribunal." *Williams*, 362 N.C. at 632–33, 669 S.E.2d at 294 (quotation marks and citation omitted).

Upon review of the record, we hold the trial court was premature in concluding that the alleged violations "caused such irreparable harm to [Defendant's] case as to require a dismissal with prejudice[,]" because Defendant cannot meet his burden of demonstrating his defense has been irreparably harmed. As explained above, the unavailability of the bones for independent testing makes it impossible to determine to what extent those bones would have been helpful to Defendant's case. Under the circumstances of this case as it has progressed thus far, Defendant cannot meet his burden of demonstrating his defense has been actually, as opposed to potentially, prejudiced.

Furthermore, the thrust of the defense Motion to Dismiss and the trial court's ruling is premature. There has been no trial. The defense has yet to engage any expert, and has failed to attempt to conduct any tests, whether for DNA or to attempt to replicate the photographic identification of the decedent using the radiographs of her teeth. It may well be that upon the hiring of an expert and analyzing the partial skull remains which still are being held by the OCME, Defendant's expert may concur in the opinion of both Dr. Privette and Dr. Samuelson that the jaw bone is indeed that of Ms. Boxley. Until it can be established that the partial remains are untestable or that the identification of the deceased is somehow flawed or incapable of repetition, we fail to see how the defense has been irreparably prejudiced.

In addition, we also disagree with the trial court that dismissal of the charge against Defendant would be the *only* appropriate remedy for the State's malfeasance. At Defendant's trial, the presiding judge will be endowed with wide latitude in determining how to most fairly address any flagrant violation of Defendant's rights. Indeed, Judge Hudson contemplated such lesser remedies elsewhere in his order in response to the alleged discovery violations. Paradoxically, it is Judge Hudson's diligence and persistence that has largely prevented irreparable prejudice to Defendant up to this point.

In sum, the trial court erred by prematurely concluding that Defendant's ability to prepare a defense was so irreparably prejudiced that a dismissal of the charge pursuant to Section 15A-954(a)(4) was the only appropriate remedy.

### 2. Failure to Disclose Role of the State in Destruction

**[4]** We also disagree with the trial court's conclusion that the State's failure to produce certain evidence before the 15 August 2011 hearings warrants dismissal of the charge against Defendant. Specifically, the trial court determined that both (1) the State's failure to disclose "the role its agents took in assisting, facilitating, and paying for the permanent destruction" of the remains, and (2) Dr. Privette's failure to produce the email records subject to subpoena, each flagrantly violated Defendant's constitutional rights.

However, our Supreme Court has "previously held that due process and *Brady* are satisfied by the disclosure of . . . evidence at trial, so long as disclosure is made in time for the defendant[] to make effective use of the evidence." *State v. Taylor*, 344 N.C. 31, 50, 473 S.E.2d 596, 607 (1996) (citing *State v. Jackson*, 309 N.C. 26, 33, 305 S.E.2d 703, 710 (1983)). In *Taylor*, our Supreme Court found no *Brady* violation occurred when the State provided a defendant with new evidence four days before the close of the State's case. *Id.*

Defendant is now in possession of the information the State allegedly failed to disclose. Accordingly, he has "ample opportunity to make effective use of it." *Allen*, ___ N.C. App. at ___, 731 S.E.2d at 522 (quotation marks and citation omitted). Accordingly, we determine the trial court erred by concluding Defendant's rights were flagrantly violated under *Brady* in this regard.

### 3. Failure to Correct Misrepresentations

**[5]** The trial court also concluded that three instances in which the State "fail[ed] to correct misrepresentations of material fact . . . flagrantly violated [Defendant's] constitutional rights[.]" In support of this conclusion, the trial court cites *Napue v. Illinois*, 360 U.S. 264 (1959), for the proposition that "intentional misrepresentation[s] by the District Attorney and/or failure to correct testimony that the District Attorney knows to be false is a violation of the Due Process Clause of the Fourteenth Amendment." Irrespective of the soundness of the trial court's factual findings supporting this conclusion, we hold *Napue* is inapplicable under the facts of this case.

In *Napue*, the United States Supreme Court held that "a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 U.S. at 269. Moreover, our Supreme Court has held that "when a defendant shows that testimony was in fact false,

material, and knowingly and intentionally used by the State to obtain his conviction, he is entitled to a new trial." *State v. Sanders*, 327 N.C. 319, 336, 395 S.E.2d 412, 423 (1990).

Thus, the holding of *Napue* is not applicable to the facts of this case. Here, there has been no trial, nor has any conviction been obtained. Furthermore, the relief provided by *Napue* is the grant of a new trial to the aggrieved defendant. We therefore hold the trial court erred in its reliance on *Napue*.

### 4. Alleged Eighth Amendment Violation

[6] We again observe that we are limited on appeal "to determining whether the trial judge's underlying findings of fact are supported by competent evidence . . . and whether those factual findings in turn support the judge's ultimate conclusions of law." *Williams*, 362 N.C. at 632, 669 S.E.2d at 294 (quotation marks and citation omitted). "A trial court must make sufficient findings of fact and conclusions of law to allow the reviewing court to determine whether a judgment, and the legal conclusions that underlie it, represent a correct application of the law." *McKyer v. McKyer*, 179 N.C. App. 132, 148, 632 S.E.2d 828, 837 (2006) (quotation marks and citation omitted).

In its order, the trial court concluded:

> 8. [Defendant's] pretrial incarceration from July 14, 2010 until August 16, 2011 under a bond of $750,000.00 which he was unable to make due to his indigent status while simultaneously suppressing the disclosure of material and favorable information to [Defendant] and the Court, failing to preserve and disclose *Brady* information in the possession of the State and its agents, failing to disclose and document information that it had a statutory and constitutional obligation to disclose in a time frame established by direct court order flagrantly violated [Defendant's] constitutional rights pursuant to the Eighth Amendment to the United States Constitution.

The State does not address in its brief this portion of the trial court's order. However, we recognize the trial court's conclusion that an Eighth Amendment violation occurred is in some sense inexorably intertwined with its broader conclusions regarding constitutional violations under *Brady* and subsequent cases.

While the trial court provided numerous citations to cases discussing the due process implications of the State's actions in this

case, it did not provide similar guidance as to how the State's actions violated Defendant's rights under the Eighth Amendment. Upon review of the trial court's order, we cannot determine the precise factual or legal basis for the trial court's specific conclusion that an Eighth Amendment violation occurred in this case. Accordingly, this conclusion of law cannot support a dismissal of the charge against Defendant.

For the foregoing reasons, we hold the trial court erred in determining that the alleged constitutional violations "caused such irreparable prejudice to [Defendant's] case [such] that a dismissal with prejudice is the only appropriate remedy."

### C. Discovery Violations [Conclusions 10-12]

We turn next to the portion of the trial court's order addressing the State's alleged discovery violations. The trial court concluded the State violated Defendant's statutory right to discovery, N.C. Gen. Stat. § 15A-903, in three ways: (1) by failing to document and disclose communications between the Durham Police Department, the District Attorney's Office, the OCME, VCS, and Ms. White; and specifically (2) by willfully failing "to fully and completely disclose the substance of conversations between Dr. Clyde Gibbs and Detective Christopher Robinson"; and (3) by willfully failing "to fully and completely disclose the substance of conversations and emails as required by lawfully issued subpoena served upon Dr. Jonathan Privette," which were discoverable as a matter of law. The trial court concluded that these discovery violations warranted two sanctions: (1) dismissal of the charge against Defendant pursuant to N.C. Gen. Stat. § 15A-910(a)(3b); and (2) the suppression at any future proceedings of statements or testimony given by Detective Robinson and Dr. Privette, including "any testimony by any witness that includes any opinions in which [Dr. Privette] facilitated or enabled based upon his work in this case."

### 1. Dismissal as Sanction for Discovery Violations

[7] N.C. Gen. Stat. § 15A-903(a)(1) (2011) provides that "[u]pon motion of the defendant, the court must order . . . [t]he State to make available to the defendant the complete files of all law enforcement agencies, investigatory agencies, and prosecutors' offices involved in the investigation of the crimes committed or the prosecution of the defendant." If a trial court determines that the State has violated statutory discovery provisions or a discovery order, it may impose a

wide array of sanctions including dismissal of the charge with or without prejudice. *See* N.C. Gen. Stat. § 15A-910(a)(3b). However, "[i]f the court imposes any sanction, it must make specific findings justifying the imposed sanction." N.C. Gen. Stat. § 15A-910(d). "Given that dismissal of charges is an 'extreme sanction' which should not be routinely imposed, orders dismissing charges for noncompliance with discovery orders preferably should also contain findings which detail the perceived prejudice to the defendant which justifies the extreme sanction imposed." *Allen*, ___ N.C. App. at ___, 731 S.E.2d at 527-28 (internal quotation marks and citations omitted).

On appeal, we review the trial court's decision to impose discovery sanctions for an abuse of discretion. *See State v. Locklear*, 41 N.C. App. 292, 295, 254 S.E.2d 653, 656 (1979). An abuse of discretion may occur when the trial court's rulings are made "under a misapprehension of the law." *State v. Cornell*, 281 N.C. 20, 30, 187 S.E.2d 768, 774 (1972).

Upon review of the trial court's order, we cannot ascertain the basis for its determination that dismissal with prejudice was an appropriate sanction for the discovery violations it found. The trial court did find the State's failure to disclose certain communications amounted to a deprivation "of material and favorable information [Defendant] needed in order to make critical decisions about his case." The trial court also found that this non-disclosure was "intended to deprive the defendant of knowledge that would have enabled his attorney to prepare a successful cross examination of multiple witness[es]" and was "designed to influence [Defendant] and his counsel's assessment of the strengths and weakness[es] of the state's case as he decided whether to enter a plea of guilty or proceed to trial." However, Defendant has not yet pled guilty or had an opportunity to proceed to trial. Furthermore, Defendant is currently in possession of the evidence the State initially failed to disclose. Thus, any harm to Defendant is either speculative or moot. Nowhere in the order does the trial court "detail the perceived prejudice to the defendant" resulting from the violations which would "justif[y] the extreme sanction imposed." *Allen*, ___ N.C. App. at ___, 731 S.E.2d at 528 (quotation marks and citation omitted). Absent a finding explaining the specific and continuing prejudice Defendant will suffer, the trial court's order dismissing the charge on this basis is in error. Accordingly, we reverse the trial court's decision to grant Defendant's Motion to Dismiss on the grounds that the State violated statutory discovery provisions.

*2. Suppression as Sanction for Discovery Violations*

**[8]** At this juncture we must note that N.C. Gen. Stat § 15A-1445(a)(1) allows the State to appeal from a "decision or judgment dismissing criminal charges as to one or more counts." The General Statutes do not provide a similar right of appeal with regard to the imposition of lesser discovery sanctions upon the State.[6] However, the State has filed a Petition for Writ of Certiorari in the Alternative requesting we review the trial court's lesser sanctions, which we grant in the interest of judicial economy.

As noted, the trial court's order cites three ways in which the State violated Defendant's statutory right of discovery: (1) failing to document and disclose communications between the Durham Police Department, District Attorney's Office, the OCME, VCS, and Ms. White; and specifically (2) willfully failing "to fully and completely disclose the substance of conversations between Dr. Clyde Gibbs and Detective Christopher Robinson"; and (3) willfully failing "to fully and completely disclose the substance of conversations and emails as required by lawfully issued subpoena served upon Dr. Jonathan Privette."

N.C. Gen. Stat. § 15A-903 requires "[t]he State to make available to the defendant the complete files of all law enforcement agencies, investigatory agencies, and prosecutors' offices involved in the investigation of the crimes committed or the prosecution of the defendant." N.C. Gen. Stat. § 15A-903(a)(1) (2011). The statute defines those relevant terms as follows:

> a. The term "file" includes the defendant's statements, the codefendants' statements, witness statements, investigating officers' notes, results of tests and examinations, or any other matter or evidence obtained during the investigation of the offenses alleged to have been committed by the defendant. When any matter or evidence is submitted for testing or examination, in addition to any test or examination results, all other data, calculations, or writings of any kind shall be made available to the defendant, including, but not limited to, preliminary test or screening results and bench notes.
>
> b. The term "prosecutor's office" refers to the office of the prosecuting attorney.

---

6. The General Statutes do provide the State the right to appeal an adverse ruling on a Defendant's motion to suppress, *see* N.C. Gen. Stat. § 15A-1445(b); however, no such motion is at issue in this appeal.

b1. The term "investigatory agency" includes any public or private entity that obtains information on behalf of a law enforcement agency or prosecutor's office in connection with the investigation of the crimes committed or the prosecution of the defendant.

N.C. Gen. Stat. § 15A-903(a)(1) (2011).

As a starting point, we note that this Court has interpreted the provisions of Section 15A-903 to require production by the State of *already existing documents*. The statute imposes no duty on the State to create or continue to develop additional documentation regarding an investigation. *See Allen*, ___ N.C. App. at ___, 731 S.E.2d at 529.[7] Accordingly, to the extent the trial court concluded the State violated statutory discovery provisions because it merely failed to *document* various conversations, it erred.

However, the trial court also determined that the State failed to disclose other documented conversations. Specifically, the trial court found discoverable certain email exchanges between Dr. Gibbs, Detective Robinson, and Mr. Strout that gave context to the circumstances under which the bones were destroyed. Assuming, but without deciding, that the *documented* conversations which were not disclosed were in fact discoverable, the trial court's order imposing sanctions remains in error.

"If the court imposes any sanction, it must make specific findings justifying the imposed sanction." N.C. Gen. Stat. § 15A-910(d). As discussed above, the portions of the trial court's order justifying the sanctions focus on the entirety of the State's alleged misconduct, rather than its failure to disclose the specific communications that were discoverable. Furthermore, and perhaps most importantly, the order does not account for the fact that Defendant is in possession of the relevant information well before he stands trial. Thus, the trial court fails to detail the specific and continuing prejudice Defendant has suffered as result of the initial non-disclosure. In addition, the trial court does not explain how suppression of Dr. Privette's or Detective Robinson's testimony remedies the non-disclosure. Therefore the order does not bear any indication that the trial court "consider[ed] both the materiality of the subject matter and the totality of the circumstances surrounding [the] alleged failure to comply"

---

7. Although *Allen* was interpreting a former version of N.C. Gen. Stat. § 15A-903, the principle remains the same.

prior to finding suppression of their testimony "appropriate." N.C. Gen. Stat. § 15A-910(b) (2011).

Therefore, because the lesser discovery sanctions rest upon (1) actions that are not discovery violations; or (2) a flawed prejudice analysis, we must vacate the portions of the trial court's order suppressing related evidence as a discovery sanction. *See Blitz v. Agean, Inc.*, 197 N.C. App. 296, 312, 677 S.E.2d 1, 11 (2009) (holding that judicial actions based upon a misapprehension of law constitute an abuse of discretion).

_____

However, our decision with respect to the discovery sanctions issue in no way abrogates the authority of the judge presiding over Defendant's trial to take any appropriate action necessary to ensure Defendant receives a fair trial. The trial judge should review the discovery violations issue as the record is further developed for the purposes of determining whether any violations occurred or whether the defense is prejudiced by either (1) the absence of those bones used by the OCME to make an identification or (2) additional information subject to discovery which has not yet been disclosed.

## IV. Conclusion

For the foregoing reasons, we conclude the trial court erred by dismissing with prejudice the charge against Defendant on both constitutional and statutory grounds. Therefore, we reverse the trial court's order insofar as it dismisses the charge against Defendant. We further conclude that the trial court's imposition of lesser discovery sanctions was in error. We therefore vacate the portion of the trial court's order imposing those lesser sanctions, without prejudice to the ability of the judge presiding over Defendant's trial to take any appropriate action necessary to ensure Defendant receives a fair trial. Accordingly, the trial court's order is reversed in part, vacated in part, and remanded for further proceedings consistent with this opinion.

REVERSED IN PART; VACATED IN PART; and REMANDED.

Judges ERVIN and McCULLOUGH concur.